HENRY GLANTZ, ADMINISTRATOR, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED JANUARY 3, 1912. No. 17,223.

1. Customs: EVIDENCE. Evidence that a certain course is "generally" and "usually" pursued in a particular manner is sufficient to establish a custom. It is not essential to show that the "particular manner" is never deviated from.

2. Master and Servant: INJURY TO SERVANT: TRIAL: DIRECTING VERDICT. Evidence examined and set out in the opinion, held sufficient to sustain the verdict of the jury.

APPEAL from the district court for Lancaster county: ALBERT J. CORNISH, JUDGE. *Affirmed.*

*James E. Kelby, Byron Clark, A. R. Wells* and *M. V. Beghtol,* for appellant.

*Wilmer B. Comstock, contra.*

FAWCETT, J.

The facts in this case are stated in a former opinion, *Glantz v. Chicago, B. & Q. R. Co.,* 87 Neb. 60. The case was there reversed on account of errors in the instructions, the question of the sufficiency of the evidence being reserved. Upon retrial plaintiff again prevailed, and from a judgment on a verdict in his favor defendant appeals.

All questions of law were disposed of in our former opinion. The testimony offered upon the first trial was, by stipulation, read to the jury, and was supplemented by the testimony of the witness Snell, and additional testimony from the witness McCutchan. The one issue of fact reserved was presented to the jury in the following instructions:

"4. It is contended by the plaintiff that the defendant was guilty of negligence because at the time of the accident no man was stationed on the foot-board of the tender as a lookout to warn employees of the approaching tender.

"Touching this contention of the plaintiff, you are instructed that if you find from the evidence that at the time and place of the accident there was no rule or custom of the defendant company to keep such a man stationed on the foot-board as a lookout, having as one of his duties that of warning sectionmen and others in danger, and that this was known to the deceased, or was to plaintiff an obvious fact which he should have known, then in such case the failure of the defendant company to have a man stationed on the foot-board at the time of the accident

would not constitute negligence upon its part such as to create any liability against them, for the reason that the deceased by continuing in their employment under such circumstances would be held to have assumed any risk of danger arising from the fact that no man was stationed on the foot-board as a lookout.

"5. But it is contended by the plaintiff that there was a custom at the time and place of the accident, according to which the defendant company did keep a man stationed upon the foot-board as a lookout, and the plaintiff contends that at the time of the accident the deceased had a right to rely upon such custom, and that a man would be stationed on the foot-board who would warn him of his approaching danger. The defendant denies that any such rule or custom existed at the place where the accident occurred, their contention being that men were stationed on the foot-board only as their convenience or work required it, and that no man was stationed there for the purpose of a lookout to warn people. They contend that this was known and obvious to the deceased and others working, and that sectionmen understood that it was a duty devolving upon them to keep out of the way of approaching tenders and cars. This presents the sole question of fact which you are to determine from the evidence.

"If you find from the evidence that no such custom existed as contended by the defendant, then your verdict should be for the defendant in this action; and this would be true whether you think the failure to have a man stationed there would be negligence on the part of the railroad company or not, because by remaining in their employ under such circumstances he would have assumed the risk and waived any liability by reason of their failure to have a man stationed upon the foot-board.

"If, on the other hand, you find that there was such a custom upon the part of the railroad company at the time, to have a man stationed on the foot-board as a lookout, then you should direct your attention to the

question whether or not, considering the nature of the work that the plaintiff and the work that the defendant were engaged in at the time, the defendant was negligent in not having a man stationed on the foot-board as a lookout to warn sectionmen of the approaching danger. If you find that the defendant was guilty of negligence in this particular, and that such negligence was the proximate cause of the death of the deceased, and you further find that he was not guilty of contributory negligence upon his part and that the plaintiff has been damaged by the death of the deceased, then the plaintiff would be entitled to recover in this action in the amount of their damages."

Some objection is made to instructions 1, 2 and 3, but we do not think they are open to the criticisms made upon them. The main contention of defendant is that the evidence is so clearly insufficient to sustain a verdict in favor of plaintiff that the court should have directed a verdict in favor of defendant. In this contention we are unable to concur. By instructions 4 and 5, above set out, we think the court properly submitted the important question involved, viz., whether there existed in the yards at Havelock, at the time of the accident in controversy, a custom, upon which deceased had a right to rely, to have a man stationed on the foot-boards of its switch engines when at work in the yard, for the purpose of guarding against injury to employees or other persons who might be upon or in dangerous proximity to the defendant's tracks. In a yard as busy as that at Havelock is shown to be, where the switching "is always around a curve," it ought not to require strong evidence of such a custom to warrant the submission of the case to a jury. The dictates of common humanity would seem to demand such a custom; and when we consider that in every switching crew there are not less than two men, in addition to the engineer and fireman, the practicability of the custom becomes apparent.

Let us take the testimony of the witnesses as set out in

42

defendant's brief. Upon the former trial the witness Langdon was asked if he was familiar with the custom generally and habitually followed by railroad companies in regard to keeping a man on the front car of a string of cars being pushed in front of an engine, to which he answered, "Yes." When asked to state that custom, he said: "Why, an engine shoving a string of cars, a man is supposed to stand on the front car, the head car, and give signals to the engineer, also at the hind end, shoving and pushing the cars. Q. To give signals to the engineer, you say? A. Yes, sir. Q. What kind of signals and for what purpose? A. Why, it all depends on where we are going. Forward, shoving a string of cars, and we are going in on a side-track, going in on a track, of course he will give me a signal to slow up, to stop and go into that switch, if we was going to put a car in there, or if we saw anything; anything like that, would give that signal to the engineer, whatever signal I got from my foreman, or the man working it, that is the one I give to him. Q. Now, just challenge your attention particularly to the matter I desire to have you speak concerning. Is the purpose of this man on the end of the car also to give warning to the engineer in case a person or object is on the track in front? A. Why, yes." On cross-examination we have the following: "Q. Was it a custom to have a man on each end of the engine, on one end of the engine away from those cars, and then on the front end of those cars, to warn people to keep out of the road? A. Why, not exactly to warn people, no, but we always have, because it is always around a curve the way we are going." After testifying as to their custom when running through the shops, we have the following: "Q. But I am talking about going out in the yards, doing switching in the yards outside of the building. A. Yes, sir. Q. Is there any custom out there? A. No, sir; only just the way we are going. If we are backing up, of course, if we have a string of cars we are on the cars. Q. You get on the cars? A. Yes, sir. Q. If you are going on the cars, is

there any custom to go on the front end there? A. Whichever way we are going; of course, if we haven't any cars going with a lone engine, we generally go on the front end. Q. Go whichever way the engine is going, you generally get on the foot-board in that direction? A. If the engine is going that way we get on the front end. If going this way, backing up, and we had hold of any cars, we get on the hind end. That is the way we generally do." On his recross-examination he testified: "Q. But you say this custom does not exist except in the blacksmith shop when you are running through the building, of keeping— A. Well, it is a rule of our own. It is a custom to ourselves whichever way the engine is going, we always took it, we always rode that way, that is, mostly, but in this certain place in this blacksmith shop, we always—I don't think there was a time the engine went through there but what one of the men was on the front of the engine." On redirect: "Q. But it was done, the custom, you rode the foot-board, the way you were going? A. Yes, sir." Upon the second trial, as shown also by defendant's brief, the witness Snell on direct examination, testified: "Q. Did you see men riding on the foot-board of this engine? A. Yes, sir; they got all the time men on the foot-board behind and in front." On cross-examination he was asked: "Q. Did you tell Mr. Comstock a few minutes ago that they had men on each end? A. Yes; they have got men on each end when they are switching around. Q. What do you mean; each end of the yard or each end of the engine? A. Of the engine. * * * Q. Well, at other times when you see men on the foot-board at each end, what is their business? A. Lookout. Q. Is that what they were there for? A. Yes, sir." The above is, of course, an abbreviation of the testimony of these witnesses. The record contains more from them of similar import.

The burden of defendant's cross-examination seems to have been to get the witnesses to testify that an employee, when riding upon the foot-board of an engine, was not

there for the purpose of warning persons who might be upon the track, but for his own protection. To our minds that is a distinction without a difference. While thus riding to protect himself and the other members of his crew, and his engine also, if he saw a human being upon the track ahead, apparently oblivious of danger, it would make no difference whether he shouted a warning to the one in danger and thus cleared the track, or by signal to the engineer caused the engine to be stopped in time to avoid an accident. As the former of these two courses would be a saving of the time of the entire engine crew, and thus be of greater value to the company it is reasonable at least to suppose that that course would be pursued. However that may be, either course would ordinarily result in preventing an accident. In answer to the question propounded to the witness Langdon, one of the switching crew, "Is the purpose of this man on the end of the car also to give warning to the engineer in case a person or object is on the track in front?" he answered, "Why, yes." It would seem to us to be the duty of the company to require the man on the running-board, if he saw a person upon the track, to shout to that person, *and* to signal to the engineer. In this case neither was done. If a man had been stationed upon the foot-board on the front of the engine as it was running that day, he in all probability would have seen the deceased in time to have performed this duty, and thus a human life would have been saved, and this litigation avoided.

We think the testimony above outlined was sufficient to take the case to the jury upon the question as to whether or not at that time there existed in the yards of the defendant at Havelock a custom, usually followed, of keeping a man stationed upon the front of a car when a string of cars was being switched, or upon the foot-board on the front end of the engine when it was proceeding forward alone, or upon the foot-board on the rear of the engine when it was backing up, for the purpose not only of "lining up the switches," but for the further double

purpose of signaling to the engineer if any obstruction, whether human or otherwise, was observed upon the track, and also to sound a note of warning to anyone whom they might discover upon the track in a position indicating that that person was oblivious of his danger. If no such custom existed, as these witnesses have testified to, it would have been a very easy matter for the defendant to have shown that fact by a multitude of witnesses. That it did not attempt to do so was a circumstance which the jury would be warranted in taking into account as a tacit corroboration of the testimony introduced by plaintiff. Under the evidence and circumstances above shown, we think it would have been error on the part of the district court to have directed a verdict for the defendant. If so, then the question of defendant's negligence was for the jury. The jury found for plaintiff upon the evidence and circumstances shown, and we do not feel at liberty to disturb their verdict.

It is urged that the amount of the recovery is excessive; but we cannot say that it is so clearly excessive as to warrant us in substituting our judgment for that of the jury and the trial court.

The judgment of the district court is therefore

AFFIRMED.

ROOT, J., took no part in the decision.

LETTON, J., dissenting.

I am of the opinion that the evidence is not materially changed from that produced at the former trial and is insufficient to justify the submission to the jury of the question whether the alleged custom existed.

BARNES, J., dissenting.

I cannot concur in the conclusion reached by the majority of my associates in this case. As a ground for a recovery the plaintiff alleged that it was the custom of

the defendant company to station a man upon the foot-board of its engines while switching cars in its yards in order to warn its trackmen to get out of the way of such engines and cars; and that it failed to observe that custom at the time the accident occurred. On this question the burden of proof was upon the plaintiff. As I read the record the plaintiff failed to carry this burden. The majority opinion contains a statement of some of the evidence introduced for that purpose, but not all of it. From this evidence it seems clear that the witness was an unlearned foreigner, unacquainted with the use and meaning of the English language, and failed to comprehend the questions propounded to him on his direct examination; for when matters were explained to him upon his cross-examination he answered squarely that when a member of the switching crew rode upon the foot-board of an engine he did so for the purpose of "lining up the switches." This was the truth of the whole matter, and agrees with that knowledge which is common to all men who have used their ordinary powers of observation. It is well known to every one of ordinary intelligence that in switching cars in railroad yards a member of the switching crew takes his place upon the foot-board of the engine, and thus rides from one switch to another for the sole purpose of throwing such switches as may be necessary when passing from one side track to another. Performing the work in that manner not only saves time, but the unnecessary expense of employing an extra man at every switch target in extensive railroad yards. Again, it is a matter of common knowledge, and has been frequently declared to be the law, that one who takes employment with a railroad company as a trackman assumes the risk arising from the passing of locomotives and trains upon the railroad tracks. In other words, he impliedly agrees that he will keep his own lookout, and get out of the way of passing trains. Notwithstanding this fact, in order to affirm what to my mind is an unjust and illegal judgment, the majority are driven to the

absurd position of holding, as it seems to me, without competent evidence, that it was the custom of the defendant to keep a man upon the foot-board of its engines to warn trackmen in its employ to get out of the way of its passing trains. The absurdity of this matter is apparent when we remember that oftentimes a switch engine is not attached to the front end of a string of cars; that it frequently pushes a string of cars ahead of it in switching operations. If so, how could a person placed upon the foot-board of the engine warn a trackman to get out of the way of such a train?

In the case at bar it was shown that the engine bell was ringing at the time the accident in question occurred. It was also shown that there was a great amount of noise being made by a passing freight train and so it may be said that if a man had been stationed upon the foot-board of the engine in question at the time this accident occurred he could not have made himself heard above the noise of the bell and the passing train so as to have given the deceased any warning at all of the approach of the engine.

Without extending this dissent to any greater length I conclude by saying, that to my mind there is no competent evidence in this record to show the existence of the custom on which the plaintiff must rely in order to sustain the judgment of the trial court, and upon this question I appeal to the record.

It appears that at the close of the testimony the defendant requested the court to direct a verdict in its favor. I am of opinion that the request should have been granted; that it was error to submit the case to the jury, and the judgment of the district court should be reversed.