### McCOMB v. C. A. SWANSON & SONS.
#### Civ. No. 227–46.

District Court, D. Nebraska,
Omaha Division
May 6, 1948.

718

William S. Tyson, of Washington, D. C., and Reid Williams and John A. Weiss, both of Kansas City, Mo., for plaintiff.

A. C. R. Swenson, of Omaha, Neb., 'for defendant.

DELEHANT, District Judge.

The plaintiff, in his designated official capacity, proceeding under the jurisdictional grant of Title 29 U.S.C.A. § 217, prays for injunctive relief against the defendant, forbidding the latter's violation of Title 29 U.S.C.A. § 215, subsections (1), (2) and (5), being Section 15(a) subsections (1), (2), and (5) of The Fair Labor Standards Act of 1938, hereinafter referred to as "the Act of 1938". Substitution of William R. McComb for L. Metcalfe Walling as the Administrator-plaintiff was made during the pendency of the action, and will not be further noted. The corporate existence of, and engagement in, and production of goods for, commerce by the defendant in the operations within the action's scope are unquestioned.

Complaint was originally filed in the case on October 4, 1946. Anderson v. Mt. Clemens Pottery Co. 328 U.S. 680, 66 S.Ct. 1187 90 L.Ed. 1515, had been decided on June 10, 1946. The complaint was harmonized, both in factual content and in legal theory, with that ruling. In general terms, it charged that the defendant in its operations since June 16, 1944, had repeatedly violated the provisions of Sections 7 and 15(a) (2) of the Act of 1938 by employing many of its employees in commerce and the production of goods for commerce for work weeks exceeding forty hours without compensating them for work in excess of forty hours per week at the statutory rate; and the provisions of sections 11(c) and 15(a) (5) by failing to make, keep, and preserve adequate and accurate records "of the hours worked each work day and each work week, with respect to many of its employees;" [1] and the provisions of section 15(a) (1) by the transportation and sale in commerce of goods in whose production employees were employed in violation of Section 7 of the Act of 1938. Upon motion therefor, confessed by the plaintiff, a Bill of Particulars was furnished in which the employees involved were limited to those working in certain departments, and which specified as the violative practices the making and keeping of employees' time records "without regard to the time spent by said employees in

_____

[1] The parenthetical employment at this point in the pleading of the phrase "among other things" is noted, but has no essential consequence.

changing clothing and in other preparatory and necessary incidents to said employment", and upon the basis of the starting and finishing times for their work shifts rather than of the accurate total time of employment. Thereafter, and on December 12, 1946, the defendant answered, denying the violative practices charged against it.

With the action thus pending and at issue, the so-called Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq., was approved on May 14, 1947. It will hereinafter be referred to as the "Act of 1947".

On September 22, 1947 the defendant requested leave to amend its answer in such manner as to present the Act of 1947 as a defense to the complaint. One day later, the court ordered the holding on October 2, 1947 of a pretrial conference in pursuance of Rule 16 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The conference was held on the appointed day. During it, leave was granted for the filing of the defendant's proposed amendment to its answer. In response to inquiries, in the course of the conference, by defendant's counsel, the plaintiff's attorneys made two supplemental and clarifying statements touching their position in the case. These were (a) that the amount of time involved in their charge of "changing clothing and * * * other preparatory and necessary incidents to said employment" was approximately twenty minutes per day per employee, and (b) that such items were compensable by reason of a custom or practice in effect at the establishment where the involved employees were employed.[2] Similar, and more detailed answers in writing were later made by counsel for the plaintiff in response to written interrogatories served under Rule 33 of the Federal Rules of Civil Procedure. The court has no doubt of the sufficiency of the answers to inquiries and interrogatories to present the question of "custom or practice".

On November 6, 1947, the plaintiff served, and on November 10, 1947 filed, an amended complaint and amended Bill of Particulars which essentially brought the averments of his earlier complaint and bill of particulars up to the date of the newer pleadings and amplified them in some measure. The defendant then answered those pleadings, denying any violative practices and averring facts and making denials designed to present the Act of 1947 as a special defense.

The action has been tried upon its merits and the court has had the benefit of exhaustive and thorough typewritten briefs and arguments of counsel and has carefully reviewed the evidence and examined the stenographically reported testimony of the witnesses and the exhibits.

From the pleadings—so far as they are in agreement—and from the evidence and stipulations upon the trial, the court now finds the following facts:

The evidence narrows, in some measure, the area of alleged violation. Thus, in his brief, the plaintiff correctly states that, "This case involves only the defendant's employees employed in eviscerating, canning, egg, and creamery departments of its operations in Omaha, Nebraska." To the extent that the complaint and bill of particulars may be construed as charging violations in other departments or plants of the defendant's business, it may be understood that no such issue persists in the record of the trial. Nor, despite the general allegation in the complaint of the defendant's failure to compensate its employees at overtime rates for hours worked, beyond the statutory limitations of hours for straight rate pay, is there any evidence which even tends or attempts to sustain such a charge, apart from the impact of

2 The foregoing—and other—incidents of the pretrial conference were reflected in a formal report whose accuracy remains unchallenged. The cited items are set down by way of demonstration of the error in the defendant's contention that the factor of "custom or practice" was not pleaded by the plaintiff. It is probably true that it is not formally as-serted in the complaint or bill of particulars, either original or amended; but its explicit averment in the conference is not to be ignored, particularly since it was made in response to the defendant's inquiry upon the subject. See also, upon the same point, the defendant's interrogatories and the plaintiff's answer thereto.

"changing clothing and other preparatory" and after work activities.

The defendant, a Nebraska corporation, is engaged in the business of preparing for market and marketing, largely in the channels of interstate commerce, poultry, creamery products, and eggs. It prepares poultry of various kinds and in several forms, partly under its own brand, partly by contract under another food supplier's brand. It breaks eggs and processes their essential content, either canned in fluid form or reduced to powder and packaged. Its principal operations, and the only ones involved in this action, are conducted in several neighboring buildings at Omaha, Nebraska.[3] As a general practice, its employees work more than forty hours per week, exclusive of the time about which this action is concerned, and are compensated as provided by law for time so worked in excess of forty hours per week.[4]

The number of the defendant's employees at Omaha in all its departments and operations, including clerical and supervisory helpers, approximates eight hundred. But the manufacturing or processing work is subject to seasonal fluctuations and the employees vary in number throughout the year, from substantially fewer than eight hundred to something more than that figure. Of the total employees, about seventy per cent are women and thirty per cent men. In the eviscerating department about one hundred fifty women and fifty men work. In the egg department the workers vary from about fifty women and ten men to one hundred women and twenty men. In the creamery department at the time of trial were some forty-five or fifty men and about fifteen or twenty women; but at the time of highest production the workers, preserving the same general ratio, are substantially more numerous. In the canning depart-ment about two hundred twenty-five women and forty men are normally employed.

Responsive to federal and (Nebraska) state requirements, and prompted also by considerations of competitive necessity and its own pride, the defendant undertakes to maintain high standards of cleanliness in its manufacturing plant and operations. Federal inspectors are constantly on duty in its establishment to assure the observance of the rules prescribed by the federal government for such plants; and they also maintain an oversight of the compliance with Nebraska's provisions. Among the federal requirements is the prescription that "aprons, frocks and other outer clothing worn by persons who handle any product shall be material that is readily cleaned, and only clean garments shall be worn."[5] Requirement is also made for the assurance of immunity of the product to contamination by perspiration, hair, cosmetics, etc. These prescriptions are general, and their concrete application is left flexibly to the individual food processor. But that application, however achieved, must be effective.

The defendant, in the interest of cleanliness, throughout the period prescribed in the complaint, and for some time theretofore, has required and now requires the wearing by its employees of washable white uniforms in its eviscerating, canning, egg, and creamery departments. For the men in all of those departments the uniform is a coverall with buttons down the front, with this exception, that in the creamery department, an undeterminable number of men wear white T-shirts and trousers; for the women in departments other than the creamery section a bungalow apron designed without buttons and to be slipped on and removed over the head. In the creamery department the women wear an apron, or covering garment, buttoned down the

---

[3] It has also small plants elsewhere in Nebraska, in Iowa and in Colorado and, through an affiliate, in Arkansas, which have no connection with this suit. It may be observed that those outlying plants acquire in their respective trade areas much of the material later prepared at Omaha, and, to some extent, do preliminary processing upon it. This is notably true of poultry which in substantial part is killed and plucked in those outlying plants and sent to Omaha for further and final processing.

[4] This finding, of course, has no relation to the issue of time spent in changing clothing and in other preliminary and after work activities, whose examination is the subject of this memorandum.

[5] Regulations of United States Department of Agriculture, Production and Marketing Administration, governing food processing, Section 5, page 2.

front and coatlike in design. All of these uniforms, both for men and for women, are made from fairly heavy tough material. The defendant does not allow the wearing of uniforms privately designed by its employees in any of the several departments involved.

In the creamery department the employees, both men and women, purchase and own their uniforms and the defendant launders them at its own expense in a small laundry operated for that purpose by itself. In all of the other departments the uniforms are provided and owned by the defendant, without cost to the employees and the defendant has the uniforms laundered by a commercial laundry, but charges the employees for that service a sum which is approximately, though not exactly, equal to one-half of the cost of the laundering.[6] As a safety and sanitary measure, the defendant also requires that its female employees during their work wear hairnets which the employees provide at their own expense. For some, but comparatively few, of its male employees who work while standing in water or on constantly wet surfaces, the defendant at its own expense provides rubber boots whose use by the employees affected is not certainly shown to be mandatory, but is highly desirable to the defendant and the men affected from the viewpoint of the health and security of those men. Concerning those employees, the court finds that, while the defendant does not formally and imperatively require, it does prefer and desire that they wear the rubber boots which it provides for their use. In practical effect, the men involved understand that the defendant expects and requires them to wear the boots.

The defendant provides for each of its affected departments separate rooms for men and women for use in their changing into and out of their uniforms. These rooms are equipped with toilet facilities, running water for washing, seats or benches, and locker space or other equipment for the storage or hanging of uniforms, and also of clothing such as hats, women's coats, men's overcoats, and any other clothing which each employee may remove and store during working time, as well as other personal effects. For at least two of the departments involved the dressing rooms are on a floor one story either above or below the work room, thereby entailing walking between floors to reach the working stations from the dressing rooms, and vice versa.

As employees, whether men or women, are hired, they are informed by representatives of the defendant concerning its rule requiring the wearing at work of the prescribed uniform and of the arrangements for its provision (varying as already recited) and for its laundering, and are shown the rooms provided for dressing and the manner in which they are to be used.

In actual operation, the employees all put on and remove their uniforms in the rooms on the defendant's premises by it provided for that purpose; and that is the only practicable and reasonable method of conforming to the defendant's rule touching the uniforms, their use, and their laundering. The court rejects the defendant's claim—or argument—that the donning and removal on its premises of the prescribed working garments are not required by it, but are practiced by the employees at their election and of their own free choice. It is, indeed, true that no formal rule of the employer requiring the use of the dressing rooms has been pointed out, and that it would be strictly possible for a worker to wear his or her uniform to work and to return home in it. But it would be only narrowly and unreasonably possible. It could not be done as a matter of practical and feasible operation, regard being had to the employer's requirements in respect of cleanliness and laundering. Besides, the soiled, discolored and odiferous characteristics of many, and perhaps most, of the uniforms at

---

[6] The arrangement just recited is the present posture of an evolutionary process in the understanding between the defendant and its employees on the subject of the purchase, and payment of the cost of the laundering, of uniforms. Essentially also, it was in effect in June of 1944 and has been operative continuously since that time. As to the present division of laundering costs, it has resulted from the absorption by the defendant of all increases therein after the time of an earlier agreement whereunder the employees were charged fixed sums for laundry service, which fixed sums have not since been increased.

the end of a day's work (vide infra) would reduce to comparative absurdity the suggestion that they "could" be worn home. Realistically, only a negligible few of them could be.

In most of the departments affected, the work done by the great majority of the employees is of such character that garments worn during it become soiled in greater or less degree, requiring changes to new laundered uniforms varying in frequency from daily to two or three times weekly. This is notably true in the eviscerating, canning and egg departments and, in substantial measure, in the creamery department. However, in all of those departments, except possibly the eviscerating room, there are some employees whose work is fairly free from the accumulation of disfiguring substances. The soiling elements include suggestively, but not exclusively, blood, serum, offal, pin feathers, fragments of meat and the like in the eviscerating department; egg shell fragments, egg fluid and powdered egg particles in the egg department; cream, milk and butter elements in the creamery department; and general animal substances in the canning department.

Except for the item of rubber boots already noted, the defendant does not require its employees to change their shoes or stockings before or. after work. Nor does it have any requirement touching their removal, before putting on their uniforms, of any item or items of their ordinary clothing. It has no requirement of combing hair, washing hands, or other personal cleansing operation either before or after work. At their own pleasure, the employees may put their prescribed uniforms on over their ordinary clothes or may remove the outer portions of those clothes and wear only their under garments and the uniforms. They actually proceed differently as between employees in that respect, and even the same employee proceeds differently as his or her available time and inclination may prompt, or the seasonal temperature suggest. For example, during the trial one man, working in the eviscerating department, was called from his work as a witness. The court observed that he wore the prescribed uniform while he testified; but beneath it, and through its openings could be clearly seen his coat, trousers, and other ordinary garments. In large number, however, the employees remove their street shoes and hose, or in some cases their shoes only, and change into others which they wear while working, and. then reverse the process at the day's end. Similarly, the practice of removing the outer garments of their ordinary clothing (in addition, of course to hats, overcoats and other cold weather protection) before donning the uniform, and of changing back after work is widespread and probably obtains with a substantial majority of the workers. That probability is not strictly demonstrable, but is reasonably inferable, from the evidence. They are prompted in these respects by their own personal tastes and preferences, by considerations of flexibility and comfort in working, and of the cleanliness and durability of their personal clothing. But over such matters the defendant assumes and exercises no control or supervision. It does not even express or signify a wish or preference touching them or any of them.

The defendant allows each of its female employees, especially in the eviscerating department, to use a plastic apron outside, and as a protection for, her uniform. It does not require the use of such an article which is entirely optional with the employees. The defendant provides these aprons, requiring a deposit by each employee using one of them of one dollar, which is a little more than one-third of its cost to the defendant, and refunding the deposit on the return of the used apron at the end of the worker's service. Women workers may, also optionally, wear white jackets outside their uniforms; and if they do the defendant furnishes the jackets. Otherwise no garment, (e. g. a sweater) may be worn over, or protrude beyond, the uniform.

The defendant prescribes no interval of time before the opening of work when the employees shall be on its premises. They come at their pleasure as to time, with the single requirement that they be at their respective posts in uniform and ready for work when the moment arrives for the

commencement of their work.[7] Five minutes before the beginning of the working time a warning signal is sounded, to the end that employees may thus be admonished to be ready seasonably for work. This signal is clearly identified by testimony as being given in connection with the egg and eviscerating operations, and it is fairly to be concluded that it obtains generally throughout the plant.

Upon coming to work the employees first proceed to their dressing rooms and make such change of clothes as they may respectively undergo as an incident to putting on their uniforms. For some of them, at least on occasion, this involves only the donning of the uniform. But for most of them it generally includes one, or more, or all of the following operations; (a) for the women, the removal of shoes, and often of stockings, and the putting on of separate work shoes, or shoes and stockings, the removal of an outer dress, or of slacks if such garment is being worn in lieu of a dress, the putting on of the uniform, the adjustment of a hairnet, if one was not worn from home, occasionally some rearrangement of hair, and (for those who use either) the putting on over the uniform of a plastic apron or a white jacket; (b) for the men, change of shoes or shoes and stockings, including the getting on of rubber boots by those who use them, the removal of outer street clothes, and the putting on and buttoning of the coverall uniform or by some in the creamery department the two piece uniform; and (c) for all, the hanging or placing in safe keeping of any personal clothing they may have removed.[8] They proceed from their dressing rooms, walking to their working posts. In the egg breaking department each breaker as she goes to her working position gets a bucket and some "chips", or counters by which the number of buckets of eggs broken by her are to be measured, for piece work pay computation, but this operation seems to be done more or less as a digression in proceeding to work.[9]

At the close of the day's work shift, each worker proceeds to the appropriate dressing room and, in the matter of dressing, essentially reverses the process for him or her pursued on the opening of that work day as above outlined. That operation, however, generally includes also washing of hands or of hands and face, and, in the case of women who use a plastic apron, the washing of that apron. Women also frequently comb or rearrange their hair for street wear.

Upon the question of the time reasonably and necessarily consumed in the clothes changing process, most of the male witnesses estimated it to require about ten minutes both before starting and after finishing work, while most of the female witnesses made a similar estimate for the commencement of the day, but said that "a little longer" (estimated from a minute to four minutes) was required for the after work change. It is true that some witnesses gave substantially lower estimates

[7] In this connection attention is given to a factual statement in the plaintiff's brief made positively and not as an inference from evidence. He declares: "With few exceptions all employees report from thirty to forty minutes in advance of the regular starting time in order to be ready at the designated starting time." That categorical assertion is simply untrue. There is no evidence warranting it. A very few employee witnesses stated that they did reach the defendant's premises this early, but not any number adequate to support the quoted assertion. And those so testifying attributed their early arrival to personal factors, such as the availability of an early ride to work with a friend or the lack of any demand upon the time of the witness. Besides its objective invalidity, the statement is calculated to mislead one into the assumption that such early reporting is either required by the defendant or necessitated in the circumstances of the worker's employment. It is neither.

[8] No special mention is made here of the removal and hanging of hats or special protective garments necessitated or prompted by the weather, such as raincoats, scarves, ornaments, women's coats, men's overcoats or topcoats. Such items have no relationship to the instant problem and are purely personal to their wearer. Whatever the industry, such garments have to be removed and stored by workers everywhere.

[9] One witness, Mrs. Trummer, thus described the incident, "I grab my chips and dip my hands in the water which takes a split second, and I am at my place. Q. Where do you get your chips? A. Out of a little rack."

724

than that, but they were few and their appraisals cannot be said to be fairly reflective of the general testimony on the point. However, all of those estimates of time covered a wide range of operations. In some, though not many, instances they included walking between floors from the dressing room to the work bench. Most of them included washing after work's end and the changing of street clothes; nearly all, changing of shoes and stockings, or at least shoes, and, among the women, putting on or removing hairnets, combing or rearranging hair; and for those women who use either a jacket or a plastic apron over the uniform, the donning or removal of that garment, and its washing in the case of the plastic apron. Now, of all those operations, the only one required by the defendant of all employees is the changing into and out of the prescribed white uniform, in addition to which it requires each woman to wear a hairnet, which can be, and in many instances is, worn from and to their homes, though they are much more frequently changed in the dressing rooms; and, as has already been found, it requires in practical effect that a few—and not clearly established number of—men wear rubber boots. The additional changing of clothing of whatever it consists, is merely agreeable to the defendant, but is entirely within the option and discretion, and for the benefit and advantage, of the workers.

■ After due and careful study of the evidence upon the point, the court is of the opinion—and finds that the time reasonably and liberally required for the clothes changing operations either demanded by the defendant or practically necessary to the performance of the principal duties of the employees' work is approximately four minutes for the change before work and between five and six minutes at the end of the day's tasks. This finding reflects the court's appraisal, from the testimony, of the average time thus consumed which is not susceptible of precise and invariable determination. In reaching it, the court is aware that some workers will not require that much time for the change, while others moving more slowly will consume slightly more.

■ And, here, the court rejects, as not necessarily demonstrative of the time required for the dressing operations, testimony concerning the results of certain tests upon the point made under the defendant's direction. That evidence was competent and showed in some measure the time necessarily allocable to the particular changes demonstrated under ideal and unbothered conditions. And it uniformly indicated a considerably shorter interval than the court's findings in the last preceding paragraph. But the tests were not fairly reflective of the actual daily experience of the workers, in that they were generally made in a room with only two, or at most a very few, persons present, whereas, actually, the daily changes are generally, though not always, made with many fellow workers present and busied about the same efforts. That results in some confusion and delay. The court has considered that factor, but neither as slightly as the defendant desires nor as overwhelmingly as the plaintiff argues. For instance, the plaintiff would have the court suppose that all of the persons changing clothing in a departmental changing room are there and changing garments at the same time. But the evidence is otherwise. They arrive and prepare for work at their individual pleasures; and on the close of the day, especially in the eviscerating department, they proceed individually to the changing rooms upon completing their work; and they finish their work in the eviscerating room progressively through an interval of twenty-five or thirty minutes. Even in the other departments the reasonable conclusion is that the workers do not all use the dressing rooms concurrently. The court has also borne in mind the reasonable necessity to most of the workers of at least a minimum of personal washing at the end of work. That is explained by the women as a factor increasing the time requirement at the close of work.

Rest periods with pay are, and during the time material in the action have been granted to employees during which, while remaining on the defendant's premises, the employees are free to employ their time at their own pleasure. These periods are two in number of twelve minutes each for each full day of work and one of fifteen minutes

for each half day when no more than a half day of work is performed in a day. In addition, they are liberally allowed to withdraw without loss of pay from productive work for short intervals required for personal urgencies or reasonably necessary calls to or from friends. Such rest periods and releases from duty have never been related or connected, by agreement or understanding between the defendant and its employees, with the time spent in changing clothes.

In the determination of the amount of time reasonably and necessarily required for the completion of the clothes changing operations, the court has not been directly and specifically aided by the testimony offered by the plaintiff to the extent that might have been possible. Resting upon his claim that all of the activities (except walking) of the employees on the defendant's premises are compensable, his testimony touching the required amount of time has very largely been premised upon all of those activities in the aggregate rather than upon the units thereof or upon some of them in combination. But that testimony correlated with the defendant's cross examination of the plaintiff's witnesses and the defendant's own testimony has afforded an adequate basis for a reasonable conclusion on the question.

Upon the trial and in the briefs of counsel, much attention has been devoted to the question whether, within the meaning of the Act of 1947, there has been in effect at the defendant's establishment a custom or practice under which the employees have been compensated for time spent in changing clothes. At this point, the court will announce only the factual findings relevant to the issue, reserving until later the discussion of their legal consequence.

The employees at the defendant's Omaha plant are, and since September, 1942 have been represented in contractual relations with the defendant upon the matters of the terms and conditions of their employment, including working hours and wage rates, by Local 271 of the Amalgamated Meat Cutters and Butcher Workers of America, A.F.L. They have worked, during the interval since that date, under successive collectively bargained contracts in writing, which are in evidence. Those contracts are silent upon the question of payment for time employed in changing clothes or other activities either preliminary to or following the employees' principal daily activities. To that statement there is one exception. In the current contract and the one for the last preceding year there is a provision to the effect that "Freezer men and cooler men shall have reasonable time, but no more, for clothing change in changing to or from freezers or coolers". Men in such duties work in space that is damp and cold and require especially heavy clothing though they do not wear uniforms. Those departments are not at all involved in this action.

At all times concerned in this action, the defendant has had an operating rule or policy requiring each employee in each of the departments involved herein to perform any changing of clothes which he or she may undergo, either before the initiation or after the close of work, on the employee's time. This rule has been explained to each employee upon hiring. The defendant has persisted in and continues to maintain it. Before the installation of time clocks, which occurred in 1943, employees' time was recorded in time books by foremen or supervisors; and they listed only working time, exclusive of clothes changing or other incidental preliminary or after work operations. Since the installation of the time clocks, employees have been directed to check in at the clocks after dressing for work, and at the day's close to check out after the completion of the principal work and before changing clothes and cleaning up.

Among the women employees the evidence shows, with no substantial dispute that they have uniformly and consistently changed their clothes and undergone all of their other preliminary activities before reporting and checking in for work, and have checked out immediately after completing their regular tasks and changed clothes and cleaned up thereafter, and that they have fully and always understood that they were required to proceed in that fashion. The court has clearly in mind testimony touching two or three casual de-

partures from that practice but they were satisfactorily explained and do not even slightly impair the proof of the women's compliance with the rule. Consideration has been given also to the testimony of a man and a woman employed in the creamery department that they had changed clothes at the close, though never at the beginning, of the work day on the defendant's time prior to the Spring of 1946 when they were required to discontinue the practice. But the woman conceded that at all times she knew that the practice was violative of the defendant's requirement. The man denied such knowledge before 1946. However, these two witnesses do not establish a practice generally obtaining in their department even before the Spring, or April, 1946. And their testimony serves, in fact, to emphasize the defendant's insistence upon the observance of its rule even before the institution of this action.

Among the men employees the practice throughout the plant, so far as the evidence discloses, has been to complete all clothes changing operations before checking in for work at the opening of the work shift. A violation of the rule was detected and corrected among some "clean up" men who reported after the close of the ordinary work shift. But it seems clearly to have existed only briefly and as an isolated occurrence. And, save for the instance in the creamery department just mentioned, there is no evidence that after work changing was accomplished on the defendant's time, except in the eviscerating department. The plaintiff's case in support of "custom or practice", though alleged to apply to the defendant's employees generally and for both the day's opening and its closing, is narrowed by the evidence to the eviscerating department, and, even there, to the actions of the male employees, or some of them, at the end of the work day but not at the commencement of it. And the plaintiff's briefs actually stand on that position. Examination of the relevant facts is necessary.

The eviscerating department operations are performed in a single large room. It deals with the final preparation for marketing of poultry, principally chickens and turkeys. The birds are brought, slaughtered and largely plucked, and in a moist or wet condition, to a storage compartment at one end of the room. From it, a "line", or progressive work post, leads across the room terminating fairly near to the departmental time clock. In busy seasons, two such lines are maintained, with approximately similar points of origin and termination, but following different intermediate courses across the room. Men working in the storage room and at the initiation of the line get, and preliminarily align, the dead birds and start them along the operating line. Other men work in the department as cleaners and in various capacities. Many employees, mostly women but with some men, occupy positions on the operating line, and, there in assembly line fashion, perform successive individual operations on the slowly moving birds with the consequence that, at the termination of its movement, the bird is processed and ready for packing. The course of a bird on the line consumes about twenty-five or thirty minutes; so, the first worker to operate on it finishes his or her ministration on the day's last fowl about that period of time earlier than the coworker at the other end. All such work is dirty,[10] calculated to soil in varying degree the hands and garments and often the faces of those performing it.

The defendant's rule requiring its employees' clothes changes to be made on their own time has always applied to this department. It has consistently been known to the employees generally, and observed at both ends of the working day by the women and at the beginning of work by the men. But the history of its observance or violation by the men at the day's close is not equally clear or consistent. Before 1943 it was always and easily enforced by the maintenance of records of actual working time in time books. After the introduction of the time clock in 1943, a substantial number of the men, in violation of the rule, entered upon the practice of proceeding after their regular work to the dressing room, changing clothes, and thereafter checking out at the time clock, and thereby changing clothes and cleaning

---

[10] Several witnesses aptly characterize it as "messy".

up on the defendant's time. The evidence is not persuasive that this course was pursued at any time by all, or by any fairly exact proportion of the men. It is true that some male witnesses made sweeping statements that, in isolation, affirm the universality of the practice among the men in the department; but, appraised in the light of their detailed cross examination and of their bearing and demeanor as witnesses, their statements are considered by the court to be more broad and general than their demonstrated or probable knowledge. Nevertheless, it does fairly appear, and the court finds, that in substantial, though not exactly determinable number, men in the eviscerating department, with general consistency followed the practice of changing clothes and cleaning up at the end of the work day on the defendant's time. The defendant never changed its rule and never formally assented to its violation. On the contrary, its supervisor and foreman, when violations came to their attention, cautioned the violators and endeavored to correct the practice although no discharges for such violation occurred.[11] And the men were aware that they were acting in the premises in violation of a company rule and policy. Widespread violation having been detected shortly before April 26, 1946, a cautionary notice to all employees requiring observance of the rule was prepared by the management of the defendant and posted conspicuously in all of the work rooms and dressing rooms throughout the defendant's plant, including the eviscerating department. Standing alone, the language of that bulletin might be construed as the promulgation of a new rule, but the testimony overwhelmingly shows that it was not. The bulletin remained posted for different periods of time in different places. For some time, it was obeyed by the men in the eviscerating department; but eventually, many of them relapsed into the practice which they had pursued earlier. And the violation continued in substantial measure, but with consistent attempts by management to correct it by warning, which attempts did not result in its suppression. Finally, and on November 4, 1947 very shortly before the opening of the trial, and long after the institution of this action, and about a month after the pretrial conference during which the plaintiff had affirmed the alleged "custom or practice", the defendant, through its management, decisively ended the action of the men involved in the after work changing of clothes on the defendant's time. The court attributes no significance favorable to the defendant, to that act of November 4, 1947 beyond its acknowledged orientation to its earlier rule. It is regarded as an implicit admission by the defendant that the violative course at which it was aimed was substantially followed by many of the men in the eviscerating department and that its own efforts theretofore to abate it had not actually been adequate or practically effective. But the court does not construe it as any acknowledgement of antecedent acquiescence in the persistent violation of the rule.

In the course of the collective bargaining leading up to the working contract now in effect the representatives of the employees submitted in writing to the defendant and requested approval of a clause granting to the employees generally a specific period of time with pay for changing clothes before and after work, based upon the declared premise that the time reasonably required in the aggregate for that purpose was twelve minutes per day. The request was not approved, and no such provision was introduced into the contract. A similar request had been made orally and informally, and rejected, in an earlier year's negotiation.[12]

---

[11] Testimony generally to that effect was introduced by the defendant. And, more significantly, several incidents involving the detection and reproof of specifically named men were narrated, and evoked no contradicting testimony.

[12] This finding is incorporated into the present memorandum because it reflects a fact. The court rejects the inferences which both parties would draw from it.

The incident merely shows that, as of the dates of the negotiations and theretofore, there was no allowance of that character in favor of the employees, recognized alike by employer and employees. The defendant's vice-president, as a witness, said that the demand was taken into consideration by the defendant in the making of the wage increases granted in the current contract. And the plaintiff pro-

728

■ The court announces as a fact—because it involves both fact and law—that there is not and never has been at the defendant's plant or establishment any practice or custom whereby the defendant's employees performed at the defendant's expense any of the activities involved in this action, either before beginning or after performing their principal activities. And that finding extends to the men in the eviscerating department in relation to their after work clothes changing.

Upon the facts thus extensively found and narrated, the court proceeds to its legal conclusions, which may be announced with relative brevity, and,·because of.the novelty of most aspects of the issues, may not be supported by extensive judicial authority. The immediate problem has not yet evoked any considerable number of reported decisions.

■ Before reaching the substantive questions, one relating to evidence requires final answer. Upon the trial, the plaintiff offered in evidence and, upon objection, the court rejected, printed copies of the then current separate master agreements between The Cudahy Packing Company, and Armour and Company, meat packers, separately as employers, and United Packinghouse Workers of America, C.I.O. representing the employees of the two separate employers, governing employment in many cattle, sheep and hog slaughtering and meat packing plants, soap factories and the like in many states. Each of the contracts contains a provision awarding employees a specific period of time per day with pay for change of clothes and provides a method of applying the allowance in pay roll records. In his briefs the plaintiff reiterates the offer. And the court now announces its final rejection. The contracts neither prove, nor tend to prove, anything material to this action. They do show that, through collective bargaining with employees represented by an entirely different union, two employers engaged in a business, distinctly different from that of the defendant, reached an agreement for the allowance to the employees of a certain period of time with pay for changing clothes. That does not even suggest—much less prove—that in the defendant's establishment a like obligation must be fastened on it, not in consequence of treaty, but through legal compulsion. The plaintiff suggests that the contracts are instructive upon the question of the duration of a reasonable period of time to be allowed for the purpose of clothes changing. That no such issue is involved in this case is obvious. The court is presently concerned with actual and concrete experience not with general propriety. But more significantly, there is in the record not only a want of foundation for the admission of either contract, but a positive demonstration of the absence of such a foundation.

■ It may next be observed that no issue has been presented upon the constitutionality of the Act of 1947. Because this action for injunctive relief deals only with the prospective application of the Act, its validity in that phase of its operation could not seriously be assailed. In any event, the court considers it to be a constitutional exercise of congressional power. Even in respect of its application to claims for the recovery of judgments for overtime compensation arising before its enactment, its validity has been sustained in numerous decisions and with notable uniformity. In that behalf it is sufficient to mention Jackson v. Northwest Airlines, D. C. Minn., 76 F.Supp. 121, in which Judge Nordbye very recently considered favorably its constitutionality and recalled and cited the most significant decisions sustaining it.

Upon the substantive legal side of the case, the court first encounters the question whether any of·the activities involved in the present action would have been com-

fesses to derive much comfort from that statement and from the inability of the witness to say precisely how much, in the way of a wage increase, was attributed to this specific point. Such an argument can have no possible force with any one who has participated in the negotiation of contracts of like character. In any such dis-

cussion it is notorious that a multitude of demands and cross demands are considered, and the resulting contract, save in rare circumstances, is the consequence of mutual yielding, almost invariably without the precise monetary evaluation of any concession. And that is as it should be.

pensable under the Act of 1938,[13] as construed by controlling authority, prior to the approval of the Act of 1947. The answer to that question is to be made in two aspects, first, generally, and with regard to the nature and character of the activities themselves irrespective of the time consumed therein; secondly, concretely, and with regard to the actual amount of time bestowed upon any otherwise compensable activities, and the impact, upon their compensability, of the maxim de minimis non curat lex. Consideration of the second phase will appropriately be reserved for the final paragraphs of this opinion.

Upon the first phase of the question, Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 seems to this court to compel an affirmative answer. The opinion in that case is not to be read or understood as an isolated ruling. Several previous decisions of the Supreme Court foreshadowed it, but especially Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949, 152 A.L.R. 1014, and Jewell Ridge Coal Corporation v. Local No. 6167 U.M.W., 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534. In those two cases involving mining, the former of iron ore, the latter of coal, the court declared and applied, as a test or definition of "work" under the Act of 1938, the formula of "(a) physical or mental exertion (whether burdensome or not), (b) controlled or required by the employer, and (c) pursued necessarily and primarily for the benefit of the employer and his business." See 321 U.S. at page 598, 64 S.Ct. at page 703 and 325 U.S. at pages 163-168, 65 S.Ct. 1063. In default of then effective legislative expression forbidding it, that formula was held to be mandatory and not to be subject to nullification by any contrary "custom or contract". See 325 U.S. at page 167, 65 S.Ct. at page 1066. Those earlier cases dealt with the notoriously substantial intervals of time con-

---

[13] The relevant language of the Act of 1938 is as follows: Title 29 U.S.C.A. §§ 207(a) (3), 211(c) and 215(a) (1, 2, 5)

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

"(c) Every employer subject to any provision of sections 201–219 of this title or of any order issued under said sections shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of sections 201–219 of this title or the regulations or orders thereunder. June 25, 1938, c. 676, § 11, 52 Stat. 1066; 1946 Reorg. Plan No. 2, § 1, eff. July 16, 1946, 11 F.R. 7873, 60 Stat. 1095."

"(a) After the expiration of one hundred and twenty days from the date of enactment of sections 201–219 of this title, it shall be unlawful for any person—

"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206, or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation;

"(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title;

"(5) to violate any of the provisions of section 211(c) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect."

sumed in the imperative "portal to face" and "face to portal" movements of miners and with their necessary preparatory and terminal activities for each mining work day.

In the Mt. Clemens Pottery case the definition of "work" thus earlier formulated overtook the court for application to the practical realities of a substantial, but comparatively normal, manufacturing plant. Three principal elements of claimed work were presented for consideration. The first was waiting time not required by the employer and the time required for the registration of workers at a time clock used by many employees; and the claim in that respect was disallowed. Secondly, walking time for the movement from the plant gate to work bench was urged as compensable; and, here, the court made a distinction, holding that the minimum time necessarily spent in walking to work on the employer's premises following the checking in at the clock was compensable, but rejecting the claim for any larger allowance in that behalf, and especially for time voluntarily expended by the workers in digression or loitering to suit their personal convenience or pleasure. Finally, certain items characterized as "preliminary duties" or "preliminary activities" and including [328 U.S. 680, 66 S.Ct. 1195] "putting on aprons and overalls, removing shirts, taping or greasing arms, putting on finger cots, preparing the equipment for productive work, turning on switches for lights and machinery, opening windows and assembling and sharpening tools" were expressly held to be compensable. Of them, it was declared that, "These activities are clearly work falling within the definition enunciated and applied in the Tennessee Coal and Jewell Ridge cases. They involve exertion of a physical nature, controlled or required by the employer and pursued necessarily and primarily for the employer's benefit. They are performed solely on the employer's premises and are a necessary prerequisite to productive work. There is nothing in such activities that partakes only of the personal convenience or needs of the employees.

Hence they constitute work that must be accorded appropriate compensation under the statute."

Measured by the test and reasoning thus announced and applied, this court is persuaded that in the present action, speaking as of the moment of its original institution, the time necessarily spent in walking from the dressing rooms to working posts and from the working posts to the dressing rooms was probably,[14] and the time necessarily spent in donning and removing the prescribed uniforms, (and the court is disposed also to include the more doubtful putting on and removing hairnets) including rubber boots for a few, but not precisely established, number of men, was certainly compensable. Within this classification the court would include as technically compensable the "split second" interval required in the egg breaking department for getting bucket and counting chips, and in the case of one woman in the creamery test room the fixing of "set-ups" for her work, including lighting a stove, getting water for butter cooling, and balancing a scale, in respect of which, however there was no proof either exact or approximate, of the time actually required for it, but only evidence that, however long it required, it took place within an interval of between five and eight minutes before the opening of the regular work day.

So, if the Mt. Clemens Pottery case had remained unimpaired by legislative action, the next, and only remaining, inquiry would have been the effect, if any, in the established circumstances of the de minimis maxim.

But the Act of 1947 did impair the operative consequence of the Mt. Clemens Pottery ruling; and, in large measure, that was its purpose. See Title 29 U.S.C.A. § 251. This court does not suggest that the Act of 1947 is to be regarded as the vacation of a judicial decision. It is rather in this respect the clarifying amendment of the Act of 1938 as theretofore construed by the Supreme Court. The court must, therefore, determine the consequence of

14 Note the words "was probably". The Act of 1947 having been approved before the trial and "walking time" being admittedly within its reach, the plaintiff made and now makes no claim in respect of "walking time" and did not present testimony designed to sustain such a claim as having been valid at any time.

the Act of 1947 in the present case. Its presently pertinent language follows: Title 29 U.S.C.A. § 254(a) (1, 2), (b) (1, 2), (c).

"(a) Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947—

"(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

"(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

"(b) Notwithstanding the provisions of subsection (a) of this section which relieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either—

"(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

"(c) For the purposes of subsection (b) of this section, an activity shall be considered as compensable under such contract provision or such custom or practice only when it is engaged in during the portion of the day with respect to which it is so made compensable."

It will immediately appear that by Section 254(a) (1) all question of the compensability of walking time is removed from the case. It will have no further attention.

The court's concern is whether the remaining formerly compensable activities of the defendant's employees, as already enumerated, are within the absolution of section 254(a) (2) as limited by subsections (b) (1, 2) and (c). The conclusion of the court is that they are within its reach and that the defendant is not now or hereafter obliged to pay for them.

This court is of the opinion that the several identified activities are manifestly comprehended in the language "activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."

In denial of such a conclusion the plaintiff argues that the Act of 1938, being remedial, should be construed liberally in favor of laborers in order to achieve its purpose. That position is well taken and is readily granted. But the Act of 1947 is also, and notoriously, remedial; and it is neither to be construed niggardly nor to be administered with obvious hostility to its plain meaning and language. But the plaintiff further contends that its meaning and language are not plain; and, of the section last quoted, complains about the failure of the congress formally to define the terms "preliminary" and "postliminary" (both of which qualify the words "activity" or "activities") and "principal activity or activities".

Now the defining antecedent of the phrase "principal activity or activities" in Section 254(a) (2) appears in Section 254 (a) (1) in the language, "the principal activity or activities which such employee is employed to perform". Those words are not abstruse, obscure, or uncertain. They refer to the productive work in behalf of the employer which he hires the worker to do. For the machinist, it is the work at his bench or lathe; for the store clerk, the sale of goods; for the carpenter the labor in the erection or repair of a

building. And for a poultry eviscerator, it is the task to which he or she is assigned in the eviscerating room, be it the hanging of birds, decapitation, disemboweling, cleaning the room or any one or more of the multitude of operations in the room's service. Similar application of the term may be made in the other departments of the defendant's establishment affected by this action.

■ "Preliminary" and "postliminary" are not words of dubious, or recondite or confusing significance, even if the latter is not frequently employed. Derivatively, "preliminary activities", in the present setting are those activities which are engaged in before the threshold of, or the entrance upon, the day's principal activities. Webster's New International Dictionary defines "preliminary" as "preceding the main business", "prefatory", "preparatory". But, in the statute under examination, it has a peculiarly identifiable antecedent and definition. In the Mt. Clemens Pottery case, the phrase, preliminary duties, was used once (see 328 U.S. at page 690, 66 S.Ct. at page 1193), and the phrase, preliminary activities, was used at least twice (see 328 U.S. at pages 692, 693, 66 S.Ct. at pages 1194, 1195) in the court's characterization of the prework activities (other than waiting and clock punching and walking time) involved in that case and hereinbefore enumerated. In the dissenting opinion, the latter phrase was adopted and placed in quotation marks in at least three places (see 328 U.S. at pages 695, 696, 697, 66 S.Ct. at pages 1196, 1197). It was at the Act of 1938 as construed by that decision and at the activities thus characterized in it that the Act of 1947 was aimed. So the meaning of the term is clear, both in its etymological significance and in its accepted definition, and also and especially in the historical context of its present employment.

■ That being true, there is no real occasion for resort to the so-called "legislative history" of the Act of 1947 in search, or even in confirmation, of the legal definition of the term. Statutory language whose meaning is clear and unambiguous is not to be amplified or contracted, much less nullified, by what some congressional committee has said, even in formal report, concerning its purpose. And that is far more pointedly true in respect of observations made by individual senators or representatives, whether they be committeemen in charge of the measure containing the language or not, in the extemporaneity of congressional debate. It may be granted that the employment of such material in aid of statutory construction has become increasingly frequent and has achieved high sanction in recent years. In situations involving real dubiety it has its proper mission. But it may not unreasonably be suggested that, with some jurists, the practice is pursued in circumstances and in a manner which place them under the suspicion of attempting occasionally to obviate the obvious.

Notwithstanding the foregoing observation, the "legislative history" of the Act of 1947 emphatically confirms the court's conclusion. For in the report of the Senate Judiciary Committee on the House Roll out of which the Act originated appears the following statement:

"The following activities outside the workday are among those not to be considered compensable under the Fair Labor Standards Act unless made so by contract or by a practice or custom not inconsistent therewith:

"(1) Walking, riding, or traveling to and from the actual place of performance of the principal activity or activities within the employer's plant, mine, building, or other place of employment, irrespective of whether such walking, riding, or traveling occur on or off the premises of the employer or before or after the employee has checked in or out. Examples of this are (a) walking or riding from the plant gate to the employee's lathe, workbench, or other actual place of performance of his principal activity or activities; (b) riding on busses from a town to an outlying mine; (c) riding on busses or trains from an assembly point to a particular site at which a logging operation is being conducted.

"(2) Checking in or out and waiting in line to do so, changing clothes, washing up or showering, waiting in line to receive pay checks, and the performance of other activities occurring prior and subsequent to the workday, such as the preliminary ac-

tivities which were involved in the Mt. Clemens case.

"The foregoing list of noncompensable activities is not intended to be exhaustive but merely to indicate some types of activities outside the employee's workday which are not to be compensable under the Fair Labor Standards Act. Obviously, it would have been an impossible task for the committee to prepare an exhaustive list of all activities which under the bill are not to be considered compensable."   .

The plaintiff invites the court to adhere to a view against the present pertinence of the Act of 1947 upon the basis of the oral statements of certain senators (especially Senator Cooper) charged with the sponsorship of the measure, in debate on the floor of the Senate. The court has carefully studied the extensively cited discussion and finds that it is inadequate to sustain the plaintiff's view. It may not be exhaustively or adequately quoted or discussed here. But some of the most nearly pertinent comment may be cited briefly. Touching the changing of clothes, Senator Cooper said: "In accordance with our intention as to the definition of 'principal activity' if the employee could not perform his activity without putting on certain clothes, then the time used in changing into those clothes would be compensable as part of the principal activities. On the other hand, if changing clothes were merely a convenience to the employee and not directly related to the specific work, it would not be considered a part of his principal activity, and it follows that such time would not be compensable." That observation was made by the senator in response to a question by Senator McGrath following Senator Cooper's quotation from a portion of the committee's report in which two examples[15] had been given of items which, in the committee's opinion, should be included among

an employee's principal activity or activities and thus considered to be compensable. As the quotation in the footnote of the committee's language discloses, the two examples of the committee bear no relationship to any activity involved in this case. So far as Senator Cooper's interpretation is concerned, the court considers that the employment of uniforms in the present case does not actually fit either of his alternatives but is rather to be found within an umbral area that lies between them and has attributes of both. But to the extent that his analysis proceeds beyond the obvious purpose and intendment of the Act of 1947 itself it must be disregarded. To the extent also that it is at variance with the studied report of the committee in its reference to the "preliminary activities which were involved in the Mt. Clemens case", the report controls. The exigencies and temptations of  . legislative debates are too familiar to justify the hypothesis that informal and extemporaneous declarations during them, designed, either to win votes for a pending measure or to avert subsequent electoral wrath, may appropriately be elevated by judicial adoption to the dignity of legislation. The history of the measure in the House of Representatives is not instructive. Nor is the message of the President accompanying his approval of the Act operative to empty it of a single item of its legislative content.

Of "postliminary" it need only be observed that it is the antonym of "preliminary" and that it characterizes the activities after the close of the principal work of the day generally in the inverse order of their performance at its opening, including frequently washing the hands and face of the worker.

But by Title 29 U.S.C.A. § 254(b) (1) and (2), preliminary and postliminary ac-

---

[15] The examples in the committee's language were:

"1. In connection with the operation of a lathe an employee will frequently at the commencement of his workday oil, grease, or clean his machine, or install a new cutting tool. Such activities are an integral part of the principal activity, and are included within such term.

"2. In the case of a garment worker in a textile mill, who is required to re-

port 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are  . among the principal activities of such employees."

tivities otherwise uncompensable under subsection (a) are not so rendered uncompensable if such activities are compensable by either (1) an express agreement, either written or unwritten; or (2) "a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer." And by subsection (c), the operation of subsection (b) in allowing compensability in consequence of contract, or custom or practice for a preliminary or postliminary activity is made effective "only when" the activity "is engaged in during the portion of the day with respect to which it is so made compensable." This case presents no issue of compensability under an express agreement. The question remains, therefore, whether the plaintiff has proved a "custom or practice in effect, at the time of such activity" at the defendant's establishment, covering any activity in controversy, and rendering it compensable. In its factual recital the court has already answered this question negatively. A very few observations may be suggested in reference to that conclusion.

At the outset it may be noted that a custom or practice in effect at the time of the preliminary or postliminary activity involved at the establishment, in order to sustain compensability, must be "not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee * * * and his employer." The persistent maintenance by the defendant of the rule requiring the changing of clothes to be accomplished on the employees' time is not seriously challenged, and with only one or possibly two exceptions the male employees acknowledged their understanding that the rule existed. The women's knowledge of it appears to be entirely unquestioned. The collectively bargained contract being silent on the point, it might seriously be asserted that the rule constitutes a condition of the initial contract of employment between the defendant and each of its affected employees which would intercept the operation of any custom or practice in violation or disregard of it. But beyond suggesting that issue, the court does not proceed upon it, for the court is satisfied that no such custom or practice has been shown.

"Custom" and "practice" are also singled out by the plaintiff as congressionally undefined words. But definition of them is unnecessary. They have readily comprehensible and comprehended meanings. They are broadly synonymous, Border State Life Ins. Co. v. Monk, Tex.Civ.App., 103 S.W.2d 825; Kent v. Town of Patterson, 80 Misc. 560, 141 N.Y.S. 932; Columbia Life Ins. Co. v. Tousey, 152 Ky. 447, 153 S.W. 767; though there is a technical difference between them, United States Shipping Board Emergency Fleet Corp. v. Levensaler, 53 App.D.C., 322, 290 F. 297. "Custom" is said to be established by a long series of actions, constantly repeated, which have, by such repetition and by uninterrupted acquiescence, acquired the force of a tacit and common consent. Louisville & N. R. Co. v. Reverman, 243 Ky. 702, 49 S.W.2d 558. It must be certain, general, uniform and recognized, mere frequency of occurrence being insufficient, Aulich v. Craigmyle, 248 Ky. 676, 59 S.W. 2d 560, although it need not be shown to be free from any deviation, Glantz v. Chicago B. & Q. R. Co., 90 Neb. 606, 134 N.W. 242. "Practice", in its present context, is rarely defined in judicial opinions except by the employment of the term "custom" or "habit". Webster's New International Dictionary defines it as "an actual performance habitually or customarily engaged in". The same authority considers "custom" to mean "a form or course of action characteristically repeated under like circumstances". Uniformity and universality (though, with the tolerance of an occasional omission) and general notoriety and acquiescence must characterize the actions upon which a custom or practice is predicated, with the consequence that the parties may be considered as having understood and agreed to it. Jarecki Mfg. Co. v. Merriam, 104 Kan. 646, 180 P. 224; Rosenberg Bros. Co. v. United States Shipping Board Emergency Fleet Corp., D.C.Cal., 7 F.2d 893.

Under any reasonable appraisal of either "custom" or "practice" neither a custom nor a practice sustaining the compensability of the defendant's employees for clothes changing time ever existed in its establishment. The facts relevant to the point have been recited (supra). It is not even suggested that such custom or practice obtained in reference to preliminary activities. A rare exception aside, no one either man or woman, in any department is shown to have made the prework change on the defendant's time. And, in regard to postliminary activities, in respect of which the custom or practice is claimed by the plaintiff, the evidence does not even warrant serious argument of the point as to any department except the eviscerating room. Of the approximately two hundred employees in that department, the women, some one hundred fifty in number, have uniformly and consistently understood and recognized the rule and made all after work changes on their own time. Among the eviscerating department men, averaging about fifty in number, a substantial number, not exactly determinable, have with fair consistency disregarded the rule after quitting their regular work, although they were aware of its existence and that they were acting in violation of it. This falls far short of establishing a custom or practice within the meaning of the Act of 1947. Considering, adversely to the defendant, all such factors as laxity of inspection and detection,[16] indulgence on the score of discharge for violations prompted perhaps by the difficulty of replacing discharged employees, and especially its dubious and ambiguous enforcement action on November 4, 1947, almost immediately before the trial, the court is nevertheless unable to hold that it ever so conducted itself as practically, much less formally, to recede from or abandon its insistence upon the rule. It always adhered to its position. The court recognizes the possibility that a rule may be formally maintained but mutually disregarded in such manner and with such uniformity as to warrant the conclusion that it has been abandoned or remains only as a pretext. But this case presents no such situation. The employees who, at the close of their work days, changed their clothes and washed up before checking out acted in full consciousness of the rule and their status as violators of it. And the defendant's course upon the point, already analyzed, repels any possible inference of its practical abandonment of the requirement or its assent to its violation.

The court, therefore, concludes that the evidence fails to establish any custom or practice, within the reasonable meaning of subsections (b) (1) and (2) and (c) of Section 254, Title 29 U.S.C.A. by which the operation of subsection (a) is intercepted.

And the conclusion is also made that the Act of 1947 is effective to render uncompensable the preliminary activities involved in this case which, before its enactment, were compensable under the Act of 1938.

Finally, the significance in relation to the instant facts of the maxim, de minimis non curat lex, requires brief consideration. The writer of this memorandum acknowledges that, apart from the instruction of the Mt. Clemens Pottery case, he regards the applicability in cases of this character of the de minimis principle as out of harmony with the earlier recorded course of thinking of the Supreme Court upon the Act of 1938. But the Pottery case is now an essential part of that thinking; and it places the applicability of the

---

[16] In this connection, the court declares its finding that, while the defendant's supervisory representatives having jurisdiction over the men in the eviscerating department undoubtedly knew of a substantial number of violations, they did not know and cannot be said necessarily to have been bound to know, of its extent. Their physical positions in the plant, at the time of the closing of work shifts, did not afford them a reasonably sure view of the checking out operation. And, regard being had to the elasticity of the times of departure from the eviscerating line, the checking out time of an individual man and the hour and minute of stopping the line would afford no mathematically certain evidence of violation. Moreover, the plaintiff is mistaken factually in his assertion that a supervisory representative of the defendant regularly approved and certified the time records. The evidence is to the contrary.

rule (the circumstances of a given case warranting it) beyond present question. For in respect, both of necessary walking time (see 328 U.S. at page 692, 66 S.Ct. at page 1194), and of otherwise compensable preliminary activities (see 328 U.S. at page 693, 66 S.Ct. at page 1195), the Supreme Court declared the pertinence of the maxim; and finally upon the aggregate of both such items (see 328 U.S. at page 694, 66 S.Ct. at page 1195) it sent the Pottery case back to the district court for the computation of the time which was compensable in its characteristics and the application to it, thus computed, of the de minimis doctrine.

The rule is to be considered in the appraisal of time on this occasion upon two hypotheses; first, upon the supposition that the Act of 1947 leaves entirely intact the compensability of the otherwise compensable preliminary and postliminary activities involved in the suit; secondly, upon the plaintiff's theory that in consequence of custom or practice at the defendant's establishment, compensability should be affirmed in respect of certain of the postliminary activities.[17] In either event, the court considers the doctrine of de minimis to be applicable, and operative to defeat liability on the defendant's part.

The court has already offered its conclusion upon the time required for both preliminary and postliminary activities to the extent that they were originally compensable under the Act of 1938. That estimate, based upon the evidence, is by the court regarded as liberal to the workers. However, considered in the aggregate for both ends of the work day, and in the setting of those activities, the court is satisfied that they do not rise above the classification of minimal or trifling.

That conclusion is even clearer and altogether inescapable when it is limited in its operation to the only postliminary activities in respect of which any substantial effort has been made to establish the existence of a custom or practice.

Upon the application of the de minimis rule to a concrete set of facts, reported opinions are only slightly and suggestively instructive. But it may be observed that it has lately been applied in several cases. Anderson v. Mt. Clemens Pottery Co., D.C. Mich., 69 F.Supp. 710 (the discussion and cases cited therein); Lasater v. Hercules Powder Co., D.C.Tenn., 73 F.Supp. 264; McIntyre v. Seagram & Sons, D.C.Ky., 72 F.Supp. 366. See also Sinclair v. United States Gypsum Co., D.C.N.Y., 75 F.Supp. 439; Bridgeman v. Ford, Bacon & Davis Inc., 8 Cir., 161 F.2d 962.

Neither in the application of the de minimis rule, nor upon the general issue of the compensability of the activities about which the action is concerned, does the court consider that the allowance to employees of rest periods and minor indulgences in granting temporary excuses from active work for reasons personal to the workers have any legal consequences. Such indulgences are things apart, and stand by themselves as considerations wisely devised, in part for the comfort of the employees but in part also for the advantage of the defendant in the way of good will and efficiency among the plant's personnel.

Upon the record before it, the court is persuaded that, as the law now stands, the defendant is not in violation of the Fair Labor Standards Act of 1938 as modified by the Portal-to-Portal Act of 1947. The evidence is clearly inadequate to warrant the allowance to the plaintiff of injunc-

---

[17] It may be considered that the plaintiff also contends for the compensability of comparable preliminary activities upon the premise of "custom or practice". But such a contention, in the light of the record is simply absurd. Though not absurd in relation to certain postliminary activities of a limited number, only, of the male employees (supra), it is not well taken.

In this connection, the language of Title 29 U.S.C.A. § 254(c) expressly lim-
its the saving of compensability by subsection (b), under a contract custom or practice, to an activity engaged in during the portion of the day embraced within the particular contract custom or practice. Thus, preliminary clothes changing activities could not be rendered compensable by a contract, custom or practice relating alone to like or identical activities engaged in only postliminarily.

tive relief. The defendant may not be compelled by decree of court to do what he is by law absolved from the necessity of doing. An order is, therefore, being entered dismissing the action.