James P. MITCHELL, Secretary of Labor, United States Department of Labor, Plaintiff

v.

STEWART BROTHERS CONSTRUCTION COMPANY, a corporation, George Abel, Donald A. Stewart and Roger T. Stewart, Defendants (two cases).

Civ. Nos. 0464, 0465.

United States District Court
D. Nebraska.

March 25, 1960.

Harper Barnes, John Weiss and Gerald
Z. Rossow, Attorneys, Office of the Solici-

888

tor, United States Department of Labor, Kansas City, Mo., for plaintiff.

John W. Stewart, Lincoln, Neb., Stewart, Stewart & Calkins, Lincoln, Neb., for defendants.

VAN PELT, Judge.

### The Actions

The Secretary of Labor, James P. Mitchell, has brought two suits against Stewart Construction Company, and Donald and Roger Stewart as individuals, under the Fair Labor Standards Act. George Abel was originally named as defendant but was dismissed at the close of plaintiff's case.

Action 0464 is an action to recover alleged unpaid minimum wages and unpaid overtime compensation claimed to be due to one Floyd A. Sanders, an employee who is alleged to have filed a written request for the Secretary to bring this action.

Action 0465 is an action for equitable relief. It is alleged that the defendants are (a) failing to pay minimum wages, (b) failing to pay overtime rates, and (c) failing to keep adequate books and records. By supplemental complaint it is also alleged that Floyd A. Sanders has been discriminatorily discharged. It is prayed that the defendants be enjoined from failing to pay minimum wages and overtime and also from failing to keep adequate and accurate books and records. The supplemental complaint requests that Sanders be reinstated, be reimbursed for lost wages, and be granted such further relief as may be necessary and appropriate.

It should be noted that the Secretary does not claim that the wage for paid time is less than $1 per hour—in fact it is well in excess of that amount. Nor is it claimed that the defendants pay less than one and one-half times the regular wage rate for paid work in excess of forty hours per week.

The heart of the claim is that the defendants work their employees early and late—that is, before paid time starts and after paid time ends. It is claimed that time spent by employees before the recorded starting hour and after the recorded quitting time is not paid for at all. It is for this time that the plaintiff claims that less than $1 per hour (i. e. nothing) is paid, and again claims that less than one and one-half the regular rate (again nothing) is paid for such overtime in weeks when the employees worked in excess of forty hours. The claimed failure to record and pay for such early and late work is also the basis of the claim that defendants failed to keep adequate and accurate books and records.

As to the supplementary complaint, it is simply claimed that Sanders was discharged because of his activity in the instigation of a Wage and Hour investigation of the defendants, and for his part in these suits.

### Fair Labor Standards Act

The Fair Labor Standards Act requires an employer to pay to each of his employees "engaged in commerce" not less than $1 an hour. 29 U.S.C.A. § 206 (Supp.1958) As far as material here, the minimum wage prior to March 1, 1956 was 75¢ per hour. It is forbidden to employ such employees for a work week in excess of forty hours unless the employee is compensated for the time exceeding forty hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S. C.A. § 207(a)(1956). Employers are also required to keep records of the wages and hours of employees. Id. § 211 (c).

It is unlawful to violate the minimum wage or overtime pay provisions of the act, or to violate the record-keeping requirements. Id. § 215(a)(2), (5). As to Sanders' discharge, it is unlawful:

"(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify

in any such proceeding, * * *". (Ibid.)

The Secretary of Labor is authorized and directed to bring actions to restrain violations of this act. Id. § 211(a). The district courts are given jurisdiction to restrain such violations. Id. § 217 (Supp.1958). The question of whether money damages may be awarded in a suit to restrain violation of the prohibition against discriminatory discharge will be discussed *infra*.

When an allegedly aggrieved employee files a written request, claiming unpaid minimum wages or unpaid overtime compensation, the Secretary is authorized to bring an action to recover the amount of the claim. Id. § 216(c) (1956). The district courts have jurisdiction over such suits. Title 28 U.S.C.A. §§ 1337, 1345 (1950).

Pursuant to Rule 42, 28 U.S.C.A., the Court ordered the two cases consolidated for trial because they involved common questions of law and fact. The cases were tried to the Court, briefs were filed, and argument heard. Thereafter, plaintiff filed a motion to reopen the case and introduce testimony relative to the written demand made by Sanders for the bringing of this action.

### Commerce

The above provisions relate to those employees who are "engaged in commerce or in the production of goods for commerce." "Commerce" is defined as: "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." Id. § 203(b) (1956).

In the case at bar, the defendants' business is that of road construction, and the employees concerned are those who were engaged in road construction work. They were not producing goods, so the question is whether their road work was "in commerce."

There can be no question but that the work involved in these cases was on roads which are used as instrumentalities of interstate commerce. It is clear that U. S. Highway 83 from McCook to north of North Platte is a well-traveled main interstate highway. The same is true of U. S. Highway 283 between Elwood and Lexington. This Judge was raised in that area, and could, were it necessary, take judicial notice of the interstate character of these roads. The Court mentions number 83 because of the abundance of testimony regarding that work, and mentions number 283 because that is the job from which Sanders was discharged. The Court believes and finds that the work on other roads brought out in the evidence was also done on roads which were instrumentalities of interstate commerce. Considering the integrated road system and great mobility of motor vehicles of today, it would be difficult to find a road which is well-traveled at all, that would not be deemed an instrumentality of interstate commerce.

It must be clear that a person working on an interstate road is "engaged in commerce." As stated in Overstreet v. North Shore Corp., 1943, 318 U.S. 125, 129, 63 S.Ct. 494, 497, 87 L.Ed. 656:

> "Vehicular roads and bridges are as indispensable to the interstate movement of persons and goods as railroad tracks and bridges are to interstate transportation by rail. If they are used by persons and goods passing between the various States, they are instrumentalities of interstate commerce * * *. *Those persons who are engaged in maintaining and repairing such facilities should be considered as 'engaged in commerce'.* * * * because without their services these instrumentalities would not be open to the passage of goods and persons across state lines." (Emphasis supplied.)

In this case the work involved reworking of existing roads. While in some places a new road-bed may have been constructed and the old bed abandoned, such work is within the act. The cases of Mitchell v. C. W. Vollmer & Co., Inc., 1955, 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196, and Chambers Construction Company v. Mitchell, 8 Cir., 1956, 233 F.2d

717, clearly state that such an alternate route to supplement or supersede existing interstate transportation facilities does not fall within the prohibition of "new construction". Indeed there is good reason to believe that the "new construction" doctrine has been completely eliminated, but that question is not before the Court. See, Southern Pacific Co. v. Gileo, 1956, 351 U.S. 493, 76 S.Ct. 952, 100 L.Ed. 1357; Mitchell v. Lublin, McGaughy, & Associates, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243.

## Employers

█ These cases were directed against Stewart Construction Company, a corporation, George Abel, Donald A. Stewart and Roger T. Stewart. The reason for naming these officers of the corporation as well as the corporate entity as defendants is because of the definition of "employer" found in the act. Title 29 U.S.C.A. § 203(d) (1950) provides:

"'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *."

Thus, corporate officers or managers who actively regulate the employees are covered by the act and are liable as employers. Chambers Construction Company v. Mitchell, 8 Cir., 1956, 233 F.2d 717; Hertz Drivurself Stations, Inc. v. United States, 8 Cir., 1945, 150 F.2d 923; Mitchell v. L. W. Foster Sportswear Company Inc., D.C.Pa.1957, 149 F.Supp. 380.

The facts of the case clearly demonstrated that both Donald and Roger Stewart actively supervised and regulated the employees. As to George Abel, however, there was no proof by plaintiff of any direct or indirect action on his part in relation to the employees of Stewart Construction Company, and on motion of defendants' counsel prior to defendants introducing testimony, George Abel was dismissed.

## Unpaid Time

The business of the defendants was that of doing the basic dirt work in preparing roadbeds. This involves cutting and grading down high spots, filling low places, setting up a proper grade, etc. The employees operated heavy Diesel-powered road equipment.

The policy of the defendants was to be "in operation" by 7 o'clock A.M. In order that this policy might be effectuated, the men had to ready the machines prior to that time. The water and oil were checked. Then the starting engine was started up. When the oil was properly circulated in the starting engine, a clutch was engaged to turn over the big Diesel. After turning the Diesel for a "few minutes" to generate heat so as to facilitate starting, an attempt was made to start the Diesel. When it was started, it was warmed up before applying the load. There was some dispute in the evidence as to the time needed to warm up the Diesel. The employees were not told what, if any, time the engine was to be warmed up. They knew, however, that this was necessary in order to properly lubricate the machine and avoid excessive wear on the parts.

Robert J. Phillips, executive Vice President of the Lincoln Equipment Company, testified for defendants that there was nothing in the Caterpillar books to indicate that the Diesel engines should be idled for a period of time. On cross-examination, the plaintiff produced exhibits 1 and 8, which are operation and maintenance instructions put out for Caterpillar equipment. Pages 33 and 32, respectively, indicate that the engine should be warmed up for five minutes, and the latter indicates that during the warm-up period the engine gauges should be observed for proper readings. There is other evidence, especially by the witness Good, that it was necessary to stay on the engine during the warm-up period to check the gauges. There was other evidence that the men might drink coffee or converse with one another while the Diesel was warming up. As to the actual time spent in warm-up the evidence was in conflict. After carefully examining the statements by the various witnesses, the Court concludes that about 1½ to 3 minutes was spent in idling the Diesel to

warm it up during warm weather, and that a minimum of five minutes was so spent during the cold parts of the spring and fall. The Court finds that the warm-up period was necessary in the proper handling of such equipment.

The men would begin to arrive on the job-site at about 6:30. Those arriving early would sometimes sit in their cars and drink coffee for a few minutes or they might start the Diesel and go back to the car and converse or drink coffee. At about 6:40 to 6:50 most of the men would start getting the equipment started. Certain key personnel would start their machines, thus influencing the other men to begin. If the men didn't begin to start the machines, one of the Stewart brothers would call, at about 6:50, "let's hear some noise", or "let's see some smoke," which meant: start the engines.

When the machines were properly warmed up, the men went on out to the dirt operation. Prior to and during the warming period, the machines would be parked in a camp along the road from which they were driven to the place where the actual earth-moving work was done. They were not usually ordered to commence the actual operation "in the dirt" before 7 A.M., but it is equally clear that it was not uncommon for the men to be actually engaged in the moving of dirt at 7 A.M. There is some testimony that if the machines were properly warmed up and ready that one of the Stewarts might actually order the men to "get in the dirt" as early as 6:45 or 6:50.

The men were given a half-hour lunch period. Although there is some evidence that the men were under compulsion to cut this time short and get back to work, the Court believes on reviewing all the evidence that the men were not deprived of any of this time.

At night, the quitting time was 6 P.M. and the men were not to cease operations before that time. There was testimony that if a load were dumped at 5:59 P.M., the men were to pick up another load, even though it might require four or five,

or more, minutes to unload and take the machine back to the camp where the machines were parked for the night. This, however, presents the extreme situation. Probably the men did not usually spend more than two or three minutes after the 6 P.M. hour. There was no whistle or bell signifying the end of the day. Not all of the men carried watches. At 6 P.M., one of the Stewarts or a foreman would give a "thumbs up" signal which would be passed along, signifying that it was time to quit. The Stewarts testified that many times the signal was given a few minutes before 6 P.M., but the employees' testimony is to the contrary. They indicated that they were likely to be reprimanded if they quit two or three minutes early. On the one hand is the testimony of the defendants, who are the former employers of employees generally deemed unsatisfactory by them, and on the other hand the Court has the testimony of disgruntled former employees. The Court can only conclude, as stated above, that the employees often did not get off their machines until two or three minutes after 6 P.M.

The defendants themselves adduced testimony to show that there had been a change in their operations. Since the first of 1958, they have enforced specific orders that no man is to get on his machine before 7 A.M., nor is he to stay on his machine after 6 P.M. The stopping signal is given a few minutes early, and the men leave the machines where they are, rather than driving them back to a central camp. It is conceded that this represents a distinct change from their former policy.

The men were paid only from a 7 A.M. starting time and up to a 6 P.M. quitting time. No record was kept of any work before or after those respective times, nor were the men paid for such time. These circumstances are the bases of these suits. (There may, of course, have been different hours selected as the starting and quitting time, but in any event the time before and after such established hours was not paid for.) The defendants' testimony that men were paid

for one-half hour if they worked fifteen minutes, and nothing for less than fifteen minutes was not convincing. If such a policy existed at all, it existed as to actual dirt-moving time for which the employees are especially paid. But if, for example, a man started his machine at 6:40 A.M. and went right out when it was warmed up, the Court believes that that man was not paid a half-hour's time for this twenty minutes work. No witnesses were produced by defendants who had received pay for such time. Many tetstified for plaintiff that they were not paid for such time. The Court so finds.

The defendants have raised two defenses to justify their activity: (a) the *de minimis* doctrine applies, and (b) they are protected by the Portal-to-Portal Act.

### De Minimis

In the case of Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, the applicability of the *de minimis* doctrine to actions under the Fair Labor Standards Act was pointed out. See, also, McComb v. C. A. Swanson & Sons, D.C.Neb.1948, 77 F.Supp. 716, where Judge Delehant discusses the application of the doctrine to these cases. But as to the effect of prior cases on a particular case, it has been aptly stated:

"Upon the application of the de minimis rule to a concrete set of facts, reported opinions are only slightly and suggestively instructive." Id. at 736.

The Court has had the benefit of excellent briefs from both counsel citing cases in which given numbers of minutes were or were not held to be within the *de minimis* rule. The Court will not review them in detail. The facts of each were peculiar to itself, and the Court's conviction of the wisdom of the above quotation is reinforced. The Supreme Court's statement in the Mt. Clemens Pottery Co. case, supra, 328 U.S. at page 692, 66 S.Ct. at page 1195, 90 L.Ed. 1515, is probably as helpful as any statement along these lines. The Court there said:

"The workweek contemplated by § 7(a) must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved."

In the case at bar, the Court feels that the unpaid time spent before paid time starts must be treated separately from the time spent after paid time ended. As to the former, there was an actual effort expended by defendants to get the men to start getting the machines ready before the paid time started. The Court cannot place an exact number of minutes, but it appears that in the usual course of affairs, from ten to twenty minutes per day were regularly spent getting the machines ready.

As to the work after paid time stopped, this involved a smaller amount of time. Two or three minutes seems a fair average, and the men were almost always done within five minutes after the "thumbs up" signal was given. The defendants have testified that since the first of 1958 the men are always off their machines by six P.M., at the defendants' express order. This is corroborated by other defendants' witnesses.

Whether this policy can or will be maintained, the Court does not have to decide presently. It does appear that some of the contractors employing former employees of defendants are able to have their men off their machines at quitting time. In the light of industrial realities, the Court does not believe that an injunction need be issued to force the defendants or influence others similarly situated to write down and pay for every instance in which a man completes a particular motion or run which takes him one minute or two minutes or three minutes beyond the announced quitting time.

The policy of the Act does not require such a result.

Defendants must understand that the line between applying and not applying the *de minimis* doctrine is a narrow one, and that the Court is not saying that a wilful return to a policy of violating the law at the close of each working day, even though only for a few minutes would not cause the Court if the matter is again before it, to enjoin such a wilful violation. It is recognized that in all business relationships there must be some give and take, and that rule applies to employers and employees. The rule of fairness that prevents an employer from taking advantage of an employee likewise must be construed so that an employee will not take advantage of his employer. This Court, therefore, as above suggested, relies heavily upon what is termed "industrial realities."

██ As to the time spent in checking, starting, and warming up the machines, and in some instances of actually moving dirt before paid time starts, however, a different result is in order. The number of minutes, although not capable of exact determination, was substantially greater. Moreover, there is nothing in the nature of things to indicate that this is required by industrial realities. The testimony was that at other jobs the employers either hired particular individuals to start all the machines, or that the men commenced to start the machines after paid time began.

It is the opinion of this Court that under the facts of this case, the time spent after paid time ceased is governed by the maxim, *de minimis non curat lex*, but that the time spent prior to when paid time commenced is not so governed.

### Portal-to-Portal Act

Having determined that the amount of time worked in the morning, before pay started, is not *de minimis*, we turn to the applicability of the Portal-to-Portal Act.

Title 29 U.S.C.A. § 254(a) (1956) of the act commonly known as the Portal-to-Portal Act provides that employers are not by virtue of the Fair Labor Standards Act made liable to pay minimum wages or overtime compensation for:

"(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

"(2) activities which are preliminary to or postliminary to said principal activity or activities,

"which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities."

The question thus to be determined by the Court is whether the starting and warming up of these pieces of earth-moving equipment is part of the "principal" activities or whether it is a "preliminary" activity.

The case which brought the problem of compensation for preliminary and postliminary activities to a head is that of Anderson v. Mt. Clemens Pottery Co., supra. It was to meet the result of this case, as well as of certain preceding cases, that the Portal-to-Portal Act was passed. In the Mt. Clemens case, the phrases: "preliminary duties" or "preliminary activities" were used several times. See McComb v. C. A. Swanson & Sons, D.C.Neb.1948, 77 F.Supp. 716, 732. At pages 692 and 693 of 328 U.S., at pages 1195 of 66 S.Ct., 90 L.Ed. 1515 of the Mt. Clemens Pottery Co. case, supra, the court referred to the following as "preliminary activities": " * * * preparing the equipment for productive work, turning on switches for lights and machinery, opening windows and assembling and sharpening tools." It is claimed by defendants that under these examples the work of its employees in checking, starting and warming up the machines was "preliminary" to its actual work of moving dirt with the machines. There is legislative history, and subsequent Supreme Court decisions which weaken the effect of the above language in determining what is or is not "preliminary" activity.

Of course, the defendants are in business, not to start and warm up machines, but to do road-work by moving dirt with the machines. It is absolutely necessary that the machines be started in order to do the dirt-moving. For the proper functioning of the machines, it is necessary that the engine be properly "warmed up" so that the lubrication can circulate to the moving parts and avoid excessive wear.

In the case of Mitchell v. King Packing Co., 1956, 350 U.S. 260, 76 S.Ct. 337, 100 L.Ed. 282, the defendant was not a knife-sharpening concern, but was a meat packing house. But is was necessary that the knives used to cut the meat be sharp, as "a dull knife would slow down production which is conducted on an assembly line basis, affect the appearance of the meat as well as the quality of the hides, cause waste and make for accidents." Id., 350 U.S. at page 262, 76 S. Ct. at page 339. The employer required the workmen to sharpen the knives on other than paid time, and the court in condemning this policy stated, 350 U.S. at page 263, 76 S.Ct. at page 339:

> "We believe the facts clearly demonstrate that the knife-sharpening activities of these workmen are *an integral part of and indispensable to* the various butchering activities for which they were principally employed, and that they must be compensated for by respondent in compliance with the Fair Labor Standards Act, as amended by the Portal-to-Portal Act * * *." (Emphasis supplied.)

On the same day, the Supreme Court decided the case of Steiner v. Mitchell, 1956, 350 U.S. 247, 76 S.Ct. 330, 100 L.Ed. 267. The employees of a battery plant had to wear special clothes and take a shower at the end of the shift by reason of the caustic and toxic materials which they handled in their work. The defendants were obviously in business to make batteries; not to require people to wear special clothes and take showers. The court stated, 350 U.S. at page 256, 76 S.Ct. at page 335:

> "We * * * conclude that activities performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section 4(a)(1)."

The Court, in reaching its conclusion in the above two cases, relied extensively on a colloquy between Senator Cooper and other Senators which it quoted at pages 256–259 of 350 U.S., at pages 335, 339 of 76 S.Ct. There is some authority that the meaning of "preliminary" is sufficiently clear without resort to this legislative history or that this particular colloquy is not particularly useful. See McComb v. C. A. Swanson & Sons, supra, 77 F.Supp. at pages 732, 733.

The Supreme Court, however, in the Steiner case, 350 U.S. at page 254, 76 S.Ct. at page 334, made reference to that colloquy and stated in connection therewith: "The language of Section 4 is not free from ambiguity and the legislative history of the Portal-to-Portal Act becomes of importance."

In that colloquy Senator Cooper read from page 48 of the Committee Report that it would be an integral part of the principal activity if a lathe operator "at the commencement of his workday oil, grease, or clean his machine, or install a new cutting tool." Senator Barkley posed the following:

> "Suppose that a man is a machinist or a mechanic of some kind. He is required to go to work at 8 o'clock. Let us assume for a moment that he is not a member of an organization. He is required to enter upon the actual labor, which might be termed his principal employment, at 8 o'clock in the morning and to spend 8 hours at such principal employment. But let us suppose that his employer requires him to be on the grounds and within the shop at 7:30

in the morning in order that he may spend half an hour sharpening and preparing the tools with which he himself or his colleagues in the factory are to work. Can anybody say that under those circumstances the 40-hour workweek has been complied with, as intended by the Fair Labor Standards Act? * * * "

Senator Cooper assured him that "it is the intention of the framers of the bill that such activities shall be compensable, as a part of the principal activity."

■ In the case at bar, the Court concludes that the checking, starting, and warming up of these machines was "an integral and indispensable part of the principal activities for which the workmen are employed"—namely moving dirt with the machines. Nor does the Court believe that the driving by the employees of their machines from the camp to the actual earth-moving site falls within the provisions of § 254(a) as "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform * * *." The employee is not being given a free ride during this period; he is actually in operation of his earth-moving machine from its parking place to the site of its principal operation. The Court believes that this driving of the machine from its parking place to the site of the earth moving project is so clearly part of the employees' principal activities as to be too plain for argument, especially in light of the Court's holding that the employees had already commenced on their principal employment when they checked, started, and warmed up the machines.

■ The Court has held that the work of the men after the end of paid time was de minimis. Therefore, the question of whether this work is barred from compensation as "postliminary" is not before the Court. However, in order that any reviewing court might have a complete record, the Court holds that such activities would not be considered postliminary, but that the finishing of the work at hand and the driving of the machine

to its camp is "an integral and indispensable part of the principal activities for which the workmen are employed." Thus, but for the de minimis doctrine, such time would be compensable.

### Discriminatory Discharge

■ As noted above, Title 29 U.S.C.A. § 215(a)(3) provides that it shall be unlawful:

"to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, * * * "

Mr. Paul Chase, the Wage and Hour representative, investigated the Stewarts between May and August in 1957. At some time after the investigation (the exact time is unclear) Donald Stewart talked to Sanders alone and mentioned that "someone" had turned him in to the Fair Labor "Board".

About two weeks before he was fired, Roger Stewart called Sanders aside and asked him why he, Sanders, did not drop the case or suit, the whole thing, as it would not do any good; would cost him, Sanders, a lot of time and money, and would cost the defendants a lot of money.

Floyd A. Sanders was maintaining his residence in Auburn, Nebraska, at the time of his discharge, and was working for the Stewarts on Highway 283 between Elwood and Lexington. He testified that during the week ending Saturday, December 7, 1957, he received word that his children were unwell. There was no contradiction or further explanation on this point. On Saturday, December 7th, he asked the foreman, Darrell Heiliger, if he could get off about 3 or 3:30 P.M. to drive home to Auburn, instead of working until the usual quitting time. Permission was granted and he left.

Several witnesses testified on the issue of whether Sanders was or was not excused early on Saturday afternoon, December 7th. There was testimony on

behalf of defendants indicating that it was not intended by the employer that he be permitted to leave early, although Don Stewart testified that he had authorized the foreman to excuse Sanders on December 7. Later Don Stewart took the stand to explain his use of the word "excuse." His explanation is not convincing. The Court prior to his testimony (Stewart was in the courtroom all during the trial) had used the word "excused" at least nine times in connection with excusing witnesses who had completed their testimony. The court reporter's notes show that the Court stated as to each of the witnesses Harold Phillips, Theis, Rosenthal, Wenthworth, Beavers, Callahan, Boettcher, Robert Phillips and Gobel that they were excused and as to witnesses Boettcher and Gobel the word "excused" was used at least twice as to each of them in discussing the matter. The Court finds that Sanders was excused early on Saturday afternoon so that he could return to his home in Auburn, Nebraska, and finds that he had the permission of his foreman to make the trip.

He went home to Auburn and arose early Monday, December 9, and drove the 259 miles to the jobsite, arriving about 6:30 A.M. Roger Stewart then walked up to his car and said something to the effect that he, Sanders, and the Stewarts ought to "part partnership." Sanders said something to the effect that that was all right with him. A few minutes later, he went over and asked if he had been fired and was told that he had. He asked for his check, and was told to come back in about an hour for it, as Don Stewart had it. Sanders left and came back in about an hour and got his check.

The road construction business does not provide year-round employment. Sanders had first started working for the Stewarts about four or five years previous to the time he was fired. It is true he left in May of 1957 but the defendants thought enough of him to re-hire him in August of the same year. During the winter months some of the employees are given jobs in the Stewart shops at Lincoln. These jobs are usually given to the men who the Stewarts would most like to have available in the spring when they resume road operations. Sanders was given such employment in the winter of 1955 and 1956, but not in 1956–57.

The Stewarts maintained that Sanders was fired for not working the same hours that the other men worked, and specifically for leaving early on Saturday, December 7, 1957. Donald Stewart also made some statement to the effect that Sanders was stopping too frequently for purported reasons of getting a drink or relieving himself. He also made some complaint that Sanders stopped to talk to his coworkers.

The Court cannot see into the mind of the Stewarts. The Court can only determine intent by external acts. The Stewarts had seen fit to employ Sanders on a more or less continuous basis for four or five years. During the winter season of 1955–56 Sanders had been given work in the shops at Lincoln—work generally reserved for favored employees. After quitting in May of 1957, he was re-hired in August. After the Wage and Hour investigation, a pointed observation was made to Sanders that "someone" had turned them in. About two weeks before he was fired, Sanders was requested to drop the whole thing—which he did not do. The Court believes that when Sanders, with the foreman's approval, took off part of an afternoon that the Stewarts seized upon this oportunity to vent their displeasure at Sanders' part in these suits. The Court finds that Sanders was discriminatorily discharged.

### Record Keeping

Title 29 U.S.C.A. § 211(c) (1956) provides:

"Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall

preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder."

Exhibit 24 is a pamphlet entitled "Interpretative Bulletin" "Hours Worked", being Part 785 of Title 25 of the Code of Federal Regulations, dated December, 1955. On page 8 thereof it is provided:

"In recording working time under the act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are de minimis. This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable periods of time he is regularly required to spend on duties assigned to him.

\* \* \* \* \* \*

"It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour. Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work. For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked."

In the case at bar, the defendants did not record any of the time spent in warm-up. Even if an employee started twenty minutes early, he would not be paid anything for that time, nor would that time be in any way recorded. Nor were any of the minutes after quitting time recorded. As to the latter, the *de minimis* doctrine applies, as stated above, but as to the former, there has been a violation of the record-keeping requirement. Specifically, the violation is of those record-keeping requirements prescribed in 29 C.F.R. § 516.2.

Statute of Limitations—Case 0464

The case at bar No. 0464 was brought under the caption of: "James P. Mitchell, Secretary of Labor, United States Department of Labor, Plaintiff." Defendants claim that Floyd Sanders, the employee on whose behalf the suit is brought, should have been named as plaintiff.

The defendants' claim arises in the following manner: Title 29 U.S.C.A. § 255 (1956) provides that suits for minimum wages or unpaid overtime compensation must be "commenced" within two years after the cause of action accrued, and if not so brought, are barred. Concededly, some of the plaintiff's claims are barred. The suit was filed November 18, 1957, and the claims go as far back as July of 1955. Defendants do not rely merely on the claims which arose more than two years prior to November 18, 1957, but state that the whole action should be dismissed.

Title 29 U.S.C.A. § 216 (1956) defines the commencement of an action for purposes of the statute of limitations found in Section 255:

"In determining when an action is commenced by the Secretary of Labor under this subsection for the purposes of the two-year statute of limitations provided in section 255 (a) of this title, it shall be considered to be commenced in the case of any individual claimant on the

date when the complaint is filed if he is specifically named as a party plaintiff in the complaint, or if his name did not so appear, on the subsequent date on which his name is added as a party plaintiff in such action."

The defendants state that the employee's name was not added as party plaintiff, and hence the action must be dismissed. Specifically, defendants state on page 4 of their trial brief: "The complaint shows on its face that this alleged cause of action arose more than two years ago, and it is therefore barred by the Statute of Limitations and should be dismissed."

It is obvious that two years had not elapsed, as the causes of action arose as late as November of 1957. Thus the entire complaint could in no event be barred, either at the time that brief was written, or at the time of trial, or indeed at the time of the filing of this memorandum. The defendants' position that the complaint shows on its face that it is barred is patently erroneous. The Court does not, however, take the position that the statute is still running.

Section 216 provides that when a written request is filed by an employee claiming unpaid minimum wages or unpaid overtime compensation, "the *Secretary of Labor may bring an action* in any court of competent jurisdiction to recover the amount of such claim." (Emphasis supplied.) When the employee consents to the Secretary's bringing such an action, such consent amounts to a *waiver* of the employee's cause of action for the same wages. There is an exception to the waiver in case the action is dismissed without prejudice *on motion of the Secretary of Labor*. If the suit is successful, the award is not paid directly to the employee, but to the Secretary. As stated in Section 216(c): "Any sums thus *recovered by the Secretary of Labor* on behalf of an employee pursuant to this subsection shall be held in a special deposit account and shall be paid, on order of the Secretary of Labor, directly to the employee or employees affected.

Any such sums not paid to an employee because of inability to do so within a period of three years shall be covered into the Treasury of the United States as miscellaneous receipts." (Emphasis supplied.)

From the foregoing, it is clear that upon proper written consent being filed: the Secretary is authorized to bring the suit; the Secretary has power, as plaintiff, to move to dismiss the suit without prejudice; and the recovery, if any, is paid to the Secretary. The individual employee, by filing his consent, actually waives his cause of action; he has no power to dismiss the case; and the recovery does not run to him by virtue of the court proceedings.

As to the Secretary's power to sue without joining the employees on whose behalf he brings suit, Federal Rule 17 provides in part: " * * * a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought * * *." Under Section 216(c) and Rule 17, it is clear that the Secretary has standing to sue without joining as party plaintiffs the employees on whose behalf he sues.

It is very doubtful that the employee can be joined as an actual party plaintiff in the usual sense. His cause of action has been waived; he has no control over the suit; and he has no right against a defendant by virtue of a favorable verdict. In the recent case of Mitchell v. Richey, D.C.S.C.1958, 164 F.Supp. 419, an employer tried to counterclaim against certain of the employees in a suit brought by the Secretary under Section 216(c). The court dismissed the counterclaim on the ground that counterclaim must be against an opposing party, and the employees were not parties to the suit.

The first part of Section 216(c) indicates that the Secretary alone is to control and prosecute the suit. The latter part provides that the action is only "commenced" for limitation purposes when the employee is joined as plaintiff. The Court believes that this latter provi-

sion is satisfied when the complaint is sufficiently clear as to the employee whose wages and hours are to be called in question. In paragraph I of the amended complaint, it is clearly stated that the suit is to recover "unpaid minimum wages and unpaid overtime compensation due their employee, Floyd A. Sanders * * *." Altogether his name is mentioned five times in the complaint.

The Court has support for this position in the case of Mitchell v. Pappin & Son, Inc., 27 Lab.Cas.Par. 69,045 (D.C. Mont.1955) where the court held:

"From Section 16(c) it appears that every proceeding and step in the course of the action is conducted and controlled by the 'Administrator', and there is nothing in the language of the section to indicate that there is any joint control of the Administrator and the employee, so that, whatever the statute may require to the effect that the employee must be specifically named as a plaintiff in the action, although he may be only a nominal party, would seem to have been complied with, inasmuch as it does not appear from the authorities presented that to constitute a party plaintiff named in the action the name must appear in the caption of the complaint."

In the Pappin case, the court met the identical issue raised in this case, and held that naming the employee in the body of the complaint was sufficient.

The case of Gibbons v. Equitable Life Assurance Soc. of United States, 2 Cir., 1949, 173 F.2d 337, 338, involved an action under Section 216(b). The only person named in the caption was one Gibbons. In the body of the complaint it was alleged that other named persons had authorized Gibbons to institute the action on their behalf. The court held that the persons so named were "specifically named as parties plaintiff." Terming the defense "technical" the court stated at 339:

"The terms of the Portal-to-Portal Act indicate that one of its aims was to prevent the assertion of surprise claims by unnamed employees at a time when the statute of limitations would otherwise have run. In the case at bar, and long before the passage of that Act, the claims of the eight employees were set forth in full and they were specifically named in the complaint which alleged that they had authorized the suit." (Emphasis supplied.)

In the case of Central Missouri Tel. Co. v. Conwell, 8 Cir., 1948, 170 F.2d 641, 647, the court held that an employee was "specifically named as a party plaintiff" when her name appeared in the body of the complaint, although not in the caption. See also Culkin v. Glenn L. Martin Nebraska Co., D.C.Neb.1951, 97 F.Supp. 661, affirmed 8 Cir., 197 F.2d 981, certiorari denied 344 U.S. 866, 73 S.Ct. 108, 97 L.Ed. 671; and Ciemnoczolowski v. Q. O. Ordinance Corp., D.C.Neb.1954, 119 F.Supp. 793, affirmed 228 F.2d 929, 233 F.2d 902; Mitchell v. Mace Produce Company, Inc., D.C.Md.1958, 163 F.Supp. 342.

██ It is the Court's opinion that by stating in the body of the complaint that the suit was for unpaid minimum wages and overtime compensation due Floyd Sanders, and that Sanders had filed written request with the Secretary of Labor to maintain this action, that the provisions of Section 216(c) were sufficiently complied with so that the action was deemed "commenced" for statute of limitations purposes.

### Case 0465—Disposition

This case involves both a complaint and a supplemental complaint. The former involves the government's claim for injunction against violation of the Act's requirements for minimum wage, overtime wage, and the keeping of records. The latter involves the discriminatory discharge of Floyd A. Sanders.

██ Title 29 U.S.C.A. § 217 (1956) gives the court jurisdiction to enter an injunction for violation of the act "for cause shown." The granting of an injunction is not the routine consequence of a finding of violation. The decision of whether to grant an injunction

rests in the court's discretion, and the test to be employed in exercising its discretion was recently stated in Chambers Construction Company v. Mitchell, 8 Cir., 1956, 233 F.2d 717, 725, where the court speaking through Judge Vogel stated:

"Where the violation established is likely to resume, the court should grant an injunction. McComb v. Wyandotte Furniture Co., 8 Cir., 1948, 169 F.2d 766, 770."

The Wyandotte Furniture case would appear to place the burden on the defendant to convince the court that an injunction *should not* issue, rather than upon the government to show that it *should.* The court stated at page 770:

"Where the legality of an employer's previous acts remain in controversy under the Fair Labor Standards Act, the Administrator ordinarily should be granted an injunction, even though the employer has ceased the violation, unless the trial court soundly is convinced from the situation that there is no reasonable probability of a recurrence of the acts."

The statute, however, only speaks of an injunction "for cause shown" and it would more properly appear incumbent on the government to prove why an injunction should issue. The same court in referring to injunctive relief in a Housing and Rent Act case subsequently stated:

"Blanket injunctions against general violation of a statute are repugnant to American spirit and should not lightly be either administratively sought or judicially granted." Beatty v. United States, 8 Cir., 1951, 191 F.2d 317, 321.

The United States Supreme Court in a Clayton Act case referred to the statutory injunction procedure as follows:

"Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. * * * The purpose of an injunction is to prevent future violations, * * * and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of the past violations." United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303.

It is well settled that the cessation of illegal activity does not render the case moot. Walling v. Helmerich & Payne, Inc., 1944, 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29; Walling v. Reid, 8 Cir., 1943, 139 F.2d 323; Walling v. Fairmont Creamery Co., 8 Cir., 1943, 139 F.2d 318. But it is also well settled that discontinuance of an illegal activity "may justify a court's refusal to enjoin future activity of this nature when it is combined with a bona fide intention to comply with the law and not to resume the wrongful acts." Walling v. Youngerman-Reynolds Hardwoods Co., Inc., 1945, 325 U.S. 419, 421, 65 S.Ct. 1242, 1243, 89 L. Ed. 1705. See also Mitchell v. C. W. Bland Leather Craft, 5 Cir., 1957, 241 F. 2d 808; Mitchell v. Hodges Contracting Company, 5 Cir., 1956, 238 F.2d 380; Mitchell v. Chambers Construction Co., 10 Cir., 1954, 214 F.2d 515. The Court of Appeals for this Circuit has specifically recognized that " * * * the purpose of an injunction is not to render an employer subject to punishment for past violations of the [Fair Labor Standards] Act but merely to compel his future obedience to it." Northwestern-Hanna Fuel Co. v. McComb, 8 Cir., 1948, 166 F. 2d 932, 939.

In the case at bar, the defendants and their present employees have testified, without contradiction, that since the beginning of the 1958 work season, they have not required or permitted their employees to warm up the machines on their own time. The testimony is that no man gets on his machine before 7 A.M., and every man is off his machine by 6 P.M. The defendants testified that it was their intention, should their former practice be declared illegal, to continue their present practice in compliance with the law. It is true that they have never conceded the illegality of their former practice, and that they have tried this case in an adversary manner. But the mere fact that defendants and their counsel decided that a trial was necessary to determine if they were wrong does not impute any bad faith to their promise to abide by the Court's decision.

The government has cited the following from N. L. R. B. v. Mexia Textile Mills, Inc., 1950, 339 U.S. 563, 567, 70 S.Ct. 826, 829, 833, 94 L.Ed. 1067, apparently to show that no reason exists not to grant an injunction:

> " 'no more is involved than whether what the law already condemned, the court shall forbid; and the fact that its judgment adds to existing sanctions that of punishment for contempt, is not a circumstance to which a court will ordinarily lend a friendly ear.' "

This statement concerned an injunction to enforce a formal Board order, and as such is on a different plane from a blanket injunction to enjoin violation of a statute. Certainly, as a general principle regarding injunctive relief, it is not consonant with the court's statement in the W. T. Grant case, supra, that the moving party must satisfy the court that relief is needed. Perhaps the best answer to the claim that an injunction does not alter a party's pre-existing duties was stated by Judge Lemley in the case of Mitchell v. Helena Wholesale, Inc., D.C. Ark.1958, 163 F.Supp. 101, where he stated at 105:

> "While the plaintiff insists that the injunction here does not require the defendant to do anything that it has a legal right not to do, or to refrain from exercising any legal right that it possesses, we feel that such statement is an oversimplification. It is, of course, true that all employers subject to the Act are required to comply with its terms, still it is unrealistic to say that an enjoined employer is in the same situation as one who is not enjoined. Not only does the former labor under the stigma and embarrassment of having been found to be in violation of the law and subject to injunction, which stigma and embarrassment may have injurious effects in and of themselves but also he is subject to contempt proceedings, conviction in which entails more serious stigma and more severe consequences than the injunction itself. And out of fear of such proceedings the enjoined employer may well feel impelled to sacrifice his own views and interests to those of the Government, if he can ever discover what they are, and pending that discovery he may well be forced, out of an abundance of caution, to resolve all questions against his own interests, as the defendant did in this case and as employers so situated generally do."

In the case at bar, the defendants certainly have followed a course adverse to their own interests, as evidence of their good faith to comply if their former practices were deemed illegal.

██ The Court has a choice of several alternatives. It might grant a "permanent" injunction, and vacate it at some indefinite future time. Tobin v. Little Rock Packing Co., 8 Cir., 1953, 202 F.2d 234, certiorari denied 346 U.S. 832, 74 S.Ct. 26, 98 L.Ed. 355. The court might grant an injunction, subject to being reviewed within a stated period of time to see if vacation were appropriate. Mitchell v. Helena Wholesale, Inc., supra. The court might decline to grant

an injunction, but retain jurisdiction of the case so that if future similar violations occurred, the court could consider the record made herein. Mitchell v. Vagabond Coach Manufacturing Company, 6 Cir., 1956, 234 F.2d 261. The final possibility, of course, would be a determination that no cause had been shown for an injunction to restrain future violation. Such has been held appropriate in the face of very grudging compliance, in the hope of inducing a better attitude on the defendant's part. Mitchell v. Bland, 5 Cir., 1957, 241 F.2d 808.

The Court has carefully reviewed the facts in this case, and the consequences of granting or refusing to grant an injunction. The plaintiff has produced nothing to show that there was lack of compliance after the beginning of the 1958 construction season. The defendants' attitude throughout the trial, however, was one of antagonism at governmental interference, and reluctant compliance.

▆ Because the remedy of an injunction is such a drastic one and a year had gone by at the time of trial and awaiting the DeMario decision two years has now elapsed in which so far as shown by the record or the briefs there has been compliance, the Court concludes not to grant an injunction herein but to retain jurisdiction of the case for the purposes referred to in the Vagabond Coach case, supra. This is following the reasoning of other cases that the nature of injunctive relief is that it is "prospective, prophylactic, preventative, not punitive." Using language approved in the Sixth Circuit Court of Appeals:

> " 'In the event that in the future plaintiff deems it necessary to seek an injunction on the basis of what appear to be renewed violations by this defendant, this Court is not without power to re-open this case and to consider the entire record herein, insofar as any practice of defendant is identical or akin to that which is the subject matter of this

suit.' " Mitchell, Secretary of Labor v. Vagabond Coach Manufacturing Co., 6 Cir., 234 F.2d 261, 262.

As to the supplemental complaint, the Court has found that Floyd A. Sanders was discriminatorily discharged, in violation of the Act. Although the Court is not convinced that it will be beneficial to Sanders, the Court, to effectuate the policy of the Act, will require that the defendants offer reinstatement to Sanders.

Under the decision of the Supreme Court of the United States in the case of Mitchell, Secretary of Labor v. Robert DeMario Jewelry Inc., 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323, this Court may award the damages caused by the discriminatory discharge to Sanders. Such an award is in accord with the power under 29 U.S.C.A. § 217 to restrain violations of the Act.

It will be the order of the Court that the defendants be ordered to pay to the Secretary of Labor the sum of $101.75 to be disbursed by him under conditions as are provided in Section 216(c) for sums recovered by the Secretary in an action for unpaid minimum and overtime wages. The amount to be awarded is arrived at from examining Exhibit 21. For the week in which Sanders was discharged the two Stewarts and their two foremen each worked 60 hours. Twenty-one other men worked that week. All but four worked a part of 6 working days; 1 missed Monday and three did not work Saturday; 19 men worked only five hours on Tuesday. Of the men who worked Saturday, 3 worked 3 hours, 1 worked four, 1 eight, and 13 worked five hours. Of the 21 above mentioned, 12 worked a week totalling fifty hours, 2 worked more, 4 less, and, as above mentioned, 3 did not work on Saturday, and hence worked less than fifty hours. The Court therefore concludes that it is fair and reasonable to believe that Sanders would have worked fifty hours, and therefore figures the damages upon the basis of forty hours regular time at wages of $1.85 per hour and 10 hours of time and

a half for overtime, or a total of $101.75. Whether Sanders would have worked beyond this week in which he was discharged, is highly speculative.

## Case 0464 Disposition

The Court finds that Floyd A. Sanders has filed a written request with the Secretary of Labor to bring this suit. Further, the Court finds that while proof is not conclusive as to an exact number of minutes which were worked, that Sanders worked some warm-up time for which he was not paid. In the case of Mt. Clemens Pottery Co. v. Anderson, 6 Cir., 1945, 149 F.2d 461, 465, the court stated: "It does not suffice for the employee to base his right to recovery on a mere estimated average of overtime worked. To uphold a judgment based on such uncertain and conjectural evidence would be to rest it upon speculation." The Supreme Court reversed stating, 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515:

"Due regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof.

"When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."

See, also: Handler v. Thrasher, 10 Cir., 1951, 191 F.2d 120; Mitchell v. Agricultural Aluminum Products, Inc., D.C.S.C.1850, 161 F.Supp. 22; Parks v. Puckett, D.C.Ark.1957, 154 F.Supp. 842; Eakins v. Alvarado Broadcasting Company, D.C.N.M.1954, 125 F.Supp. 87; Neal v. Braughton, D.C.Ark.1953, 111 F. Supp. 775.

The determination of the exact amount of over-time work by Sanders is not easy. The Court has had doubts as to whether any amount should be allowed. This is in no small part because of the inadequacy of the work records on which Sanders based his claim and in part because of the doubt he cast on his records as to their reliability. He stated that he made entries each day in his book in pencil. The record is in pen. After examining

## 904

it, the Court is not convinced that all of the entries were made on the dates shown. The Court, however, is firmly convinced that Sanders did considerable over-time work for which he was not paid. Taking the record as a whole, including the testimony of other witnesses, the Court concludes that Sanders worked a minimum of ten minutes over-time each day or part of a day that he worked and that he should be compensated by computing his damages as follows: For work-weeks in which Sanders worked less than 40 hours, the rate of pay for weeks subsequent to March 1, 1956 shall be $1 per hour, except that if the addition of this time increases the total work-week beyond 40 hours, all time in excess of 40 hours shall be compensated at one and one-half the then usual rate of pay. For weeks prior to March 1, 1956, the minimum rate was 75¢ per hour and such time shall be computed on this basis. For all weeks in which Sanders worked in excess of 40 hours, this ten-minute daily period shall be compensated at the rate of one and one-half the then usual rate of pay. The period of recovery allowed by the statute of limitations is that from November 18, 1955 up to and including November 15, 1957. Since a supplemental complaint was not filed in this case, damages cannot be allowed for the period subsequent to November 15, 1957.

The costs are taxed to the defendants. Counsel for plaintiff shall prepare an order which will include damages computed as above provided. The form thereof is to be approved by attorneys for the defendants and the computations are to be submitted to attorneys for defendants for approval. Since the method of determining the amount of damages by reason of the over-time work is based upon an approximation that was not ascertainable until after a trial, no interest will be allowed except after date of judgment. This Memorandum does not constitute an appealable order. The order and decree herein provided for when finally signed shall constitute the appealable order.